22 P.3d 1012

STATE of Hawai'i, Plaintiff–Appellee,

v.

Geraldine KEALOHA, Defendant–Appellant,

and

William Kailianu Kealoha, Jr. and Bridgette B. McCrocklin, Defendants.

No. 22384.

Intermediate Court of Appeals of Hawai'i.

May 17, 2000.

Certiorari Granted June 23, 2000.

---

**367**

Opinion of the Court by ACOBA, J.

We hold that, under the facts of this case, the acts of Defendant–Appellant Geraldine Kealoha (Defendant) in allegedly manufacturing methamphetamine in violation of Hawai'i Revised Statutes (HRS) § 712–1241(1)(d) (Supp.1999), Promoting a Dangerous Drug in the First Degree, constituted a single continuous offense and not "separate and distinct culpable acts." Thus, there was no requirement that the prosecution elect a specific act to establish the "conduct" element of the manufacturing charge or that the first circuit court (the court) give the jury a specific unanimity instruction, under the rule established in *State v. Arceo*, 84 Hawai'i 1, 33, 928 P.2d 843, 875 (1996).

We conclude also that Defendant's motion for judgment of acquittal was properly denied and there was substantial evidence to support her conviction on the manufacturing charge. As to Defendant's final contention, we conclude further that the court did not abuse its discretion in denying Defendant's motion in limine to exclude evidence that Defendant sold methamphetamine to finance her cocaine habit.

Accordingly, we affirm the March 1, 1999 judgment and sentence rendered by the court against Defendant.

I.

On September 29, 1998, an indictment for drug-related offenses was issued against Defendant. Counts I and II of the indictment charged her with possession of cocaine and methamphetamine, respectively, in violation of HRS § 712–1241(1)(a)(i),[1] Promoting a Dangerous Drug in the First Degree. Count III charged her with "use or possession with intent to use drug paraphernalia ... [to] introduce into the human body a controlled substance" in violation of HRS § 329–43.5(a)

Glenn D. Choy, on the briefs, Honolulu, for defendant-appellant.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., ACOBA, and LIM, JJ.

1. Hawai'i Revised Statutes (HRS) § 712–1241(1)(a)(i) (Supp 1998), Promoting a dangerous drug in the first degree, states in pertinent part:
   (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:

(a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregated weight of:
(i) One ounce or more, containing methamphetamine, heroin, morphine, or cocaine, or any of their respective salts, isomers, and salts of isomers.

(1993),[2] Unlawful Use of Drug Paraphernalia. Count IV charged her with "knowingly manufactur[ing] the dangerous drug, methamphetamine" in violation of HRS § 712–1241(1)(d),[3] Promoting a Dangerous Drug in the First Degree. William Kailianu Kealoha, Jr. (Junior) and Bridgette B. McCrocklin (McCrocklin) were co-defendants in the instant case and were also charged in Count IV with the same violation of HRS § 712–1241(1)(d). Additionally, Junior and McCrocklin were charged in Count V with possession of methamphetamine in violation of HRS § 712–1243 (Supp.1998), Promoting a Dangerous Drug in the Third Degree, and in Count VI with Unlawful Use of Drug Paraphernalia, HRS § 329–43.5(a). Defendant's appeal pertains to her conviction on Count IV.

## II.

### A.

On November 25, 1998, prior to the jury trial herein, McCrocklin entered into a plea agreement with Plaintiff–Appellee State of Hawai'i (the State) and pled guilty to amended charges.[4] Jury trial for Defendant and Junior began on December 22, 1998. Pursuant to the terms of the plea agreement, McCrocklin testified at trial. Following the trial, Defendant was found guilty as charged on all four counts. Junior was found guilty on Counts V and VI, however, the court granted his motion for judgment of acquittal on Count IV. Defendant filed a notice of appeal on March 29, 1999.

### B.

On December 18, 1998, preceding jury selection and trial, the court entertained several motions in limine, two of which were filed by Defendant. Defendant's motion in limine number one (motion No. 1) sought to exclude, among other things, "[t]estimonial or documentary evidence relating to the [D]efendant's prior criminal records," as well as "[t]estimonial or document[ary] evidence relating to any other bad acts involving the [D]efendant[,]" such as Defendant's purported manufacturing of cocaine and use of cocaine.[5] (internal quotation marks omitted).

---

2. HRS § 329–43.5(a) (1993), Prohibited acts relating to drug paraphernalia, states:

   It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter. Any person who violates this section is guilty of a class C felony and upon conviction may be imprisoned pursuant to section 706–660 and, if appropriate as provided in section 706–641, fined pursuant to section 706–640.

3. HRS § 712–1241(1)(d) (Supp.1999), Promoting a dangerous drug in the first degree, states in pertinent part:

   A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
   . . .
   (d) Manufactures a dangerous drug in any amount; provided that this subsection shall not apply to any person registered under section 329–32.

4. Counts IV and V, as charged against Bridgette B. McCrocklin (McCrocklin), were amended by eliminating any reference to methamphetamine. Had there been no amendment to the charges, McCrocklin would have been subject to a mandatory term of imprisonment upon conviction. By virtue of the amendments, McCrocklin was given the opportunity to request a sentence of probation.

5. At the December 18, 1998 hearing on the motions in limine, the following discussion transpired among the first circuit court (the court), the deputy prosecuting attorney (the prosecutor), and Defendant's counsel:

   [PROSECUTOR]: Well, *[McCrocklin,] when she testifies[,] will be talking about things such as [Defendant] being actively involved in the making of a low grade cocaine* and that she has a cocaine habit. I feel that is relevant, because it goes to the knowing possession element of Count I, which is [Promoting a Dangerous Drug in the First Degree], cocaine. Apart from [McCrocklin's] testimony[,] what the prosecution has is a circumstantial evidence case. There are numerous items of drugs and drug paraphernalia found in bedroom 3. There is documentation as well as identification linking [Defendant] to that room. . . . I think within limits [McCrocklin] should be allowed to testify to the drug use of both defendants, because it goes to the knowing possession element.
   . . . .

   [DEFENDANT'S COUNSEL]: *Your Honor, [i]t is uncharged misconduct. I don't really feel that it goes to intent. This testimony that there*

In addressing motion No. 1, the court permitted "testimony regarding [D]efendant's alleged involvement in the manufacture of cocaine only to be considered by the jury as proof of a motive and opportunity or intent to possess." The court further indicated it would "give a limiting instruction to that effect."

Defendant's motion in limine number two (motion No. 2) sought the exclusion of McCrocklin's expected testimony "that [Defendant] was selling methamphetamine to finance her cocaine habit." The court issued

the same ruling on motion No. 2 as it had on motion No. 1.[6]

Junior also filed a motion in limine primarily aimed at excluding (1) a search warrant affidavit attesting that he sold methamphetamine twice to a confidential informant and (2) "[t]estimony of [McCrocklin] relating to [Junior] selling illegal drugs." Defendant sought to introduce the same affidavit to show that Junior had "a motive to manufacture methamphetamine." The court denied Defendant's request and thus excluded testimony related to Junior's sales to the informant.[7] However, the court indicated it

> *was a lab that was manufacturing cocaine,* I feel, is more prejudicial than probative on the issue of knowing possession of cocaine. My client is charged with possession of cocaine. The [S]tate has to prove only that she knowingly possessed it, not that there was any intent behind it. So whatever her intent is in this alleged manufacturing of cocaine I don't think is relevant to this case.
> . . . .
> THE COURT: *Will you be getting into testimony that [Defendant] manufactured cocaine?*
> [PROSECUTOR]: Yes, just I would seek to do that only because, again, it goes to the element of knowing possession of cocaine, which is one of the elements I have to prove in Count I.
> THE COURT: [Defendant's counsel], would it not be relevant to the issue of proof of motive or opportunity or intent?
> [DEFENDANT'S COUNSEL]: As far as possession of the cocaine?
> THE COURT: As far as any testimony that she was manufacturing cocaine, which the prosecutor will be using as proof of motive or opportunity or intent to possess cocaine.
> [DEFENDANT'S COUNSEL]: Your Honor, I can see it would be relevant as far as motive or opportunity to actually possess cocaine. But I feel it is more prejudicial than probative if you do the balancing test.
> (Emphases added.)

6. [DEFENDANT'S COUNSEL]: *My request on No. 2 regards [McCrocklin's] testifying that [Defendant] was selling methamphetamine to finance her cocaine habit.*
> THE COURT: [Prosecutor].
> [PROSECUTOR]: Yes, [J]udge. Same issue on that. I think its possible prejudicial impact can be cured by an instruction from the court. But I would like to get into that, at least within the realm of [McCrocklin's] knowledge. *I would like to get into that because it goes to the knowing element I have to prove for each of the Class A counts [ (counts I, II, and IV) ] against [Defendant].*
> THE COURT: What will you be getting into? What testimony will you be eliciting?

> [PROSECUTOR]: [McCrocklin] will say first she stayed in the house about two-and-a-half weeks. She was aware because she saw [Defendant] using cocaine, and that *she observed [Defendant] actually helping to sell methamphetamine, which to the best of [McCrocklin's] knowledge, the proceeds were being used to pay for the items used by [Defendant] to make cocaine* because she has a cocaine habit close to half an ounce a day, according to [McCrocklin]. I don't need to get into those specifics as far as the extent of the cocaine use of [Defendant]. *But I think her involvement as far as distribution of any of the dangerous drugs goes to the knowing element that has to be shown.* So within limits I think that is relevant, Judge, and I would ask that No. 2 be partially denied.
> THE COURT: I will issue the same ruling on this as I did to [Defendant's] evidence as to her manufacture of cocaine. That is, *I will permit it only to the extent that the jury may consider it in determining Defendant's motive, opportunity, or intent to possess the dangerous drug. And I will give a limiting instruction to this effect.*
> (Emphases added.)

7. The following occurred between the court and counsel for William Kailianu Kealoha, Jr. (Junior):

> THE COURT: Let's go with B, selling of crystal meth to confidential informant on two occasions.
> [JUNIOR's COUNSEL]: Yes, [J]udge. I was of the understanding or I believe [the prosecutor] indicated he was not going to get into that or had no reason, because *that is part of the affidavit of the search warrant, but he was going to seek introduction of such evidence on [Defendant].* Again, the fact he sold crystal methamphetamine, I believe, has nothing—he is not charged with possession, like the large quantities. *He is charged with possession of a very small quantity for personal use. So the fact he sold it to a confidential informant is, I believe, irrelevant.* Not only that, Your Honor, the fact that—I believe it was actually this [c]ourt that ruled—you had a motion to disclose confidential informant, and the court denied that re-

would allow McCrocklin to testify that Junior was selling illegal drugs because it was probative of "whether [Junior] has a motive, opportunity, or intent to possess or manufacture." [8]

## C.

The following evidence was adduced during trial. On June 12, 1998, Honolulu Police Department (HPD) Officer Jonathan Murray (Officer Murray) "obtained a search warrant to search the premises at 87–1029C Hakimo Road." At approximately 6:07 a.m. on June 13, 1998, the search team approached the residence, made entry, and secured the premises.

Once the six adults and two children found in the residence were segregated in one area,

---

quest because I think it was part of the [S]tate's representation that it was not going to be part of this case. Therefore, there is no need to find out who this confidential informant is or for me to seek it. But I just wanted to prevent any of this coming in, because then the confidential informant does become relevant and should require disclosure. Obviously, not allowing the affidavit will cure it. But the fact [Defendant's counsel] may try to raise it or just introduce it is, I think, violating the, I guess, order of disclosing or getting into that area. It is not violating it. But I think when the [c]ourt denied our request to disclose confidential informant it did so because it is not relevant in this case.

THE COURT: [Defendant's counsel].

[DEFENDANT'S COUNSEL]: Yes, Your Honor. *I want to introduce the affidavit attached to the search warrant to show that [Junior] had a motive to manufacture methamphetamine.* According to the evidence, he sold methamphetamine twice to a [confidential informant]. That was the basis for getting a search warrant. I believe it is relevant to his motive for manufacturing, his intent to manufacture. He knows what crystal methamphetamine is, since he is charged with possessing it. But basically a motive for manufacturing.

THE COURT: You don't intend to get into this?

[PROSECUTOR]: No, [J]udge. Basically the [confidential informant] was not served.

[JUNIOR'S COUNSEL]: Your Honor, I'm aware the [confidential informant's] name has not been disclosed. However, as far as issue of reliability. [The district court] thought the [confidential informant] was reliable enough based upon Officer Murray's representation, it was enough for [the district court] to issue the search warrant. I did some research under Hawaii Rules of Evidence [ (HRE) Rule] 804 that talks about other exceptions to the hearsay rule. I believe there is some indication, independent indication of reliability as far as the status of the [confidential informant], that he purchased methamphetamine from [Junior] and not [Defendant].

THE COURT: I will grant B 1. *I will not permit testimony relating to selling of crystal meth to the [confidential informant].*

(Emphases added).

8. Junior's counsel argued as follows on part B 2 of his motion in limine.

[JUNIOR'S COUNSEL]: Yes, Your Honor. Again, I believe this is the same request that [Defendant] was going to make that [Junior] was selling drugs. I believe the court ruled that as to [Defendant] it is allowed to show that, it will show motive or intent to possess a dangerous drug or drugs accused of. In this case, [Junior] is not charged with possession of large quantities, Your Honor. He is just charged with possession of a very small amount of drugs that were found in a small container and, I guess, residue from the pipe. Therefore, I think the fact that selling doesn't go into—because I could see where selling drugs and you have a whole pile of drugs, that makes sense. But when you have a little bit of drugs where it is quite clear it is for personal use, selling drugs is not, I guess, evidence for motive, opportunity or intent to possess a little drugs. So therefore, *I would ask that when [McCrocklin] does testify, or actually not only just her but any other testimony that may come out or any other evidence that may come out of [Junior's] selling illegal drugs, I don't think it is relevant even for motive, intent, or opportunity. And even if it is so, I think it is prejudicial, because who cares if [Junior] sold the drugs. He is not charged with selling. That is a separate criminal charge, manufacturing it,* and then apparently they are going to go with [McCrocklin's] testimony, I guess, the witness who charged him into that. And in the small possession charge I don't think there is any connection, judge.

[PROSECUTOR]: Same argument as to [Junior] on this that I made as to [Defendant], again within limits. [McCrocklin], assuming she has actual knowledge, should be able to testify about [Junior] distributing drugs. Because again, it goes to the knowing possession element of Count V, which is the dangerous third charge against [Junior]. *But it is also relevant as to Count IV, the Class A drug lab charge against [Junior], as far as to show he knowingly manufactured or knowingly aided in the manufacture of methamphetamine.* So we find it germane and relevant material within boundaries.

THE COURT: *I will deny B 2 to the extent that it does provide that the jury may consider such testimony on the issue of whether [Junior] had a motive, opportunity, or intent, to possess or manufacture.* I will give a limiting instruction based on that.

(Emphases added).

Officer Murray served William Kealoha, Sr. (Kealoha, Sr.) and Junior each with a copy of the search warrant. In their search, the police found "[c]ertain items ... in [a bedroom designated as] bedroom three [ (in a trial exhibit) ] and in the kitchen area that led [them] to believe [that] there was the possibility of a clandestine [drug] lab in the residence."[9] Upon this discovery, the residence was evacuated and Detective Danny Cappo (Detective Cappo), the head of the HPD "clandestine lab team," was contacted. The lab team collected all pertinent evidence and the search resumed.

HPD Officer Gordon Goo (Officer Goo) testified he secured a female, later identified as Defendant, in a bedroom. Officer Goo related that when he entered the bedroom, Defendant was "standing near the doorway ... [and it] appeared that she just had gotten up from a dead sleep." Defendant was the only person in the bedroom.

Two Hawai'i State driver's licenses issued to Defendant were found in the bedroom. HPD collected many items from the bedroom including "ziplock" bags containing cocaine and methamphetamine, glass pipes commonly used to smoke these drugs, and other drug paraphernalia.

HPD Detective Michael Cho (Detective Cho) was the "supervisor in charge of the search warrant[.]" He testified that acetone and coffee filters—items commonly used "in the wash process for the drugs—were [also]

found in Defendant's bedroom." According to the detective, "a lot of tools for [a clandestine] lab" were found in the kitchen area of the residence, including "a small glass jar [with] liquid in it, and ... at the bottom of the jar [were] crystals forming and also around—the rim of the jar."

Within the kitchen, HPD Officer Paul Pladera (Officer Pladera) found a calibron scale and a digital "Tanita" scale. The scales were located on a black metal file cabinet containing letters addressed to Defendant. Officer Pladera also found a "blue and yellow [metal container] ... with the word 'acetone' on it" (Exhibit 97); a transparent plastic cylindrical container containing "a covered glass jar with a black liquid in it" (Exhibit 98); a package of coffee filters; and another scale in the kitchen area. HPD Officer Phillip Aguilar (Officer Aguilar) testified that acetone and "[P]yrex" dishes were in the kitchen area. Defendant's fingerprints were identified on one of the Pyrex dishes.

McCrocklin testified at trial pursuant to her plea agreement. Before McCrocklin took the stand, however, a bench conference was held to discuss the previous motions in limine Nos. 1 and 2 concerning her testimony. As a result of the conference, the court excluded any testimony by McCrocklin of Junior's alleged manufacturing of cocaine, but allowed McCrocklin to testify about Defendant's manufacturing of cocaine.[10]

---

9. Honolulu Police Department Detective Michael Cho (Detective Cho) testified that the search was halted for the following reason:

> Officer Chris Luando [(Officer Luando)] brought to [my] attention that there was a small fruit jar is the best way to describe it, a small glass jar that had some liquid in it, and when you looked at the jar, at the bottom of the jar you could see crystals forming and also around the—the rim of the jar. Officer Luando was a member of the clandestine lab team, he was a certified member, and when he brought it to my attention, that along with some other items found in—in the home led us to believe that there was some type of a lab present in the home.

Detective Cho testified that the aforementioned jar was found in the kitchen and "[t]hat is where we found the—a lot of the tools for the lab but we also found acetone and coffee filters which were also used in the—in the wash process for the drugs in [Defendant's] bedroom."

10. The following relevant transaction occurred at trial:

> [JUNIOR'S COUNSEL]: Your [H]onor, my motion in limine I asked that certain acts are bad acts would be in limined out and I am not aware or I'm trying to—I don't remember if I—specifically a ruling as to the facts that [McCrocklin] can testify ... that [Junior] ultimately manufactured cocaine. Now there's no charge of cocaine associated with my client and I know—I think the court may have ruled out, that was granted, but I'm making that request at this point, that she does not testify as to the fact that she assisted in cocaine. I'm pretty sure it was but I'm not sure.
> [DEFENDANT'S COUNSEL]: Your [H]onor, in my motion in limine number two, I asked that that be regarding the manufacture of cocaine but the [c]ourt denied that but said could come in for the limited purpose of proving opportunity, motive or intent.
> [JUNIOR'S COUNSEL]: I think it was opportunity, motive and intent for the possession

#### D.

McCrocklin testified that on June 13, 1998, she was living with Junior, her then-boyfriend of three months. Defendant also lived at 87–1029C Hakimo Road. During that time, McCrocklin "smoked" rock cocaine and crystal methamphetamine with Defendant and also witnessed Defendant selling methamphetamine. Junior told McCrocklin that he, too, was selling cocaine.

McCrocklin believed that Defendant was "refining methamphetamine into what's known as crystal meth or ice[.]" The deputy prosecuting attorney (the prosecutor) questioned McCrocklin about her observations of Defendant's conversion of methamphetamine into crystal meth as follows:

> [MCCROCKLIN] A: [Defendant] would put [the methamphetamine] in a pan and we would all sit and watch it change from powder to rock, from powder to rock.
>
> [PROSECUTOR] Q: Now this object that she placed into the pan, did she tell you what it was?

charge of cocaine but not for manufacturing ice so—
> THE COURT: *[Junior's counsel], your motion did not ask in limiting [McCrocklin] testifying as to manufacture of cocaine.*
> [JUNIOR'S COUNSEL]: Okay. If it did not, I'd like to address it at this point, [Y]our [H]onor.
> THE COURT: State plans to get into that?
> [PROSECUTOR]: Judge, I want to make sure I understand [Junior's counsel's] position. He wants to exclude all mention of cocaine as it relates to [Junior]?
> THE COURT: Manufacture of cocaine.
> [JUNIOR'S COUNSEL]: *Manufacturing of cocaine as to [Junior].*

The prosecutor responded that the testimony was relevant for the following reasons:

> [PROSECUTOR]: I'd have to object. I think it is relevant as far as the knowing possession of drugs and the awareness of [Junior] not only as to the meth lab[,] but also as to the existence of cocaine in the house. I'll grant you he's only charged with the dangerous third and the meth count which is Count IV and the paraphernalia, but I do believe it is relevant as to state of mind, as to the state of mind of [Junior] so I would ask that [McCrocklin] at least be allowed to mention that.

When the court questioned the prosecutor on the nature of McCrocklin's anticipated testimony "with respect to any type of manufacture of cocaine as it relates to Junior[,]" the following transpired:

> [PROSECUTOR]: *Basically it's mostly going to be directed to [Defendant]. As far as manu-*

A. Yes. She said it was crystal meth.

Q. And what did she tell you, if anything, was the purpose of placing it in the pan?

A. She didn't really say. She just said that, you know, it has to change and it does it by itself.

. . . .

Q. . . . Did you ever see her with something that she just referred to as ice or crystal?

A. Yes.

Q. What about flavoring? Was that ever used or talked about before by [Defendant]?

A. Yes.

Q. Tell us about that[,] please.

A. She would buy coconut flavoring. She would add it to the meth that she already had to improve the quality or hoping to improve the quality.

*facture, [Junior] knew about it but I don't recall if she's going to testify that he actively participated in the making of it. So my position is it is relevant as to state of mind by [Junior] as to the existence of dangerous drugs on the premises.*
> [JUNIOR'S COUNSEL]: Your [H]onor, I think she may testify[,] and of course we don't know exactly what she'll testify to[,] but I think she says that [Junior] had taught [Defendant] how to make rock cocaine[,] actually. That's what I have in my transcript here. I could be wrong or may have misread the transcripts or misread the tape, transcribed it but that's what I have. But, again, he is aware that there were drugs present but he's only charged with methamphetamine so—
> THE COURT: *I'll grant the motion as to [Junior]*
> . . . .
> [DEFENDANT'S COUNSEL]: Your Honor, in that case I *would like to ask you to reconsider the motion as to [Defendant]. She's not charged with manufacturing cocaine, only with manufacturing methamphetamine.*
> [PROSECUTOR]: She was manufacturing the methamphetamine and having [Junior] sell it to support cocaine, to support a cocaine habit so again *it goes to the knowing element.*
> THE COURT: *I'll deny your reconsideration.* This applies differently to [Defendant] as it does to Junior

(Emphases added).

Q. And what did she tell you about what else she was doing with the meth besides the coconut flavoring?

A. Well, she would—she was waiting for it to become a good product in order to sell it.

. . . .

Q. And do you know what she did as far as making it into a finished product?

A. Well, like I said, most of [the methamphetamine] they'd buy itself. She would add other kinds of meth and she would buy the qualities and things and add to it and add to it in order to improve the quality, or at least try to, and then she would ask us to test if we thought it was right. Even if we didn't think it was all right, she would—she would use it or she would sell it.

McCrocklin witnessed Defendant "mixing different batches" of methamphetamine in a dish "several times." No other chemicals were added to the mixture, and the mixing did not involve "any kind of heating process[.]" According to McCrocklin, this mixing continued "off and on the entire time [she] was there."

McCrocklin disclosed she "was asked to get [denatured alcohol] out of the cupboard a few times" and heard Defendant mention it "many times." The denatured alcohol was used in "burners" on the kitchen table to heat pipes and vials, and in the cooking process of "rock" cocaine.

Dean Yamamoto (Yamamoto), a HPD crime scene supervisor and "clandestine laboratories investigations coordinator," testified as the State's expert witness "in the area of methamphetamine lab identification and methamphetamine conversion procedures." Yamamoto described the steps employed in converting powdered methamphetamine into crystal methamphetamine as follows:

[YAMAMOTO]: Okay. When we're talking about clandestine drug labs, when we're talking about a conversion drug lab, it is one of three—three clandestine drug labs that we've seen here locally. What a conversion lab is, is basically taking one form of methamphetamine and converting it to another form of methamphetamine. In this particular case, what we're looking at is you're taking a liquid—methamphetamine, first of all, does not come in the glass or ice form that we see on T.V. and on commercials and what-not in the newspaper.

Methamphetamine comes in various forms. It comes in dark or light-colored liquid, dark-colored liquids like dark shoyu-colored liquid. It also comes in amber colored liquids like iced tea color liquids. It also comes in various solids. It'll be like a peanut butter color or brownish tannish color solid.

*In a conversion lab, what people are trying to do is take the form of methamphetamine and convert it over to the ice form of—or the glass form that we see or [are] more familiar with. And in this particular—there are various ways to do it. One of the ways is to take either denatured alcohol, water, dissolve it, the form of methamphetamine in that, drain it out in filter paper, evaporate that out and then re[-]crystallize it with acetone to get that ice or glass colored type.*

According to Yamamoto, the presence of certain implements indicated the presence of a methamphetamine manufacturing lab or a conversion lab.

[YAMAMOTO]: In a conversion lab[,] there are various items that we may be looking for. First of all, in a clandestine drug lab, people may get the idea that you have to have chemical glassware such as you see in chemical laboratories, like at the University of Hawaii, or in a chemical laboratory at like a high school. But when you're talking about drug conversion type labs, people have been known to use any type of glassware that can—is made to withstand heat such as [P]yrex dishes, Visionware kind of dishes that are made for cooking. So we look at all these various types of factors. We also look for glasswares with white-colored residue, the amber-colored liquids that I talked about earlier, the presence of brown-colored powders or solids as well as chemicals that are maybe in the area such as acetone and denatured alcohol.

In Yamamoto's opinion there was a methamphetamine conversion lab present at the Hakimo residence on June 13, 1998. He described the lab as a "box" lab, where all the glassware and chemicals are "boxed or placed in one area." On cross-examination, Yamamoto was asked whether there was any scientific process to determine when a "box" lab was last used. Yamamoto responded that only a "common sense approach" was employed. This approach involved determining whether liquids were still present on the glassware.

### E.

As to Count IV, the court instructed the jury as follows:

> In Count 4 of the [i]ndictment [Defendant] is charged with the offense of Promoting a Dangerous Drug in the First Degree.

> A person commits the offense of Promoting a Dangerous Drug in the First Degree if she knowingly manufactures the dangerous drug methamphetamine.

> There are two elements of the offense of Promoting a Dangerous Drug in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.

> These elements are:

> 1. That on or about June 13, 1998, in the City and County of Honolulu, State of Hawaii, [Defendant] did manufacture the dangerous drug methamphetamine in any amount; and

> 2. That she did so knowingly.

> Manufacture means to produce, prepare, compound, convert, or process a dangerous drug, either directly or indirectly, by extraction from substances of natural origin, or independently · by means of chemical conversion or synthesis.

These instructions were given, as modified, by agreement. No objections to the manner in which the court read the instructions to the jury were made.[11]

On December 30, 1998, after the State rested,· Defendant moved for a judgment of acquittal, in which Junior joined. The court granted Junior's motion for acquittal as to the manufacturing charge in Count IV, but denied Defendant's motion on the same count. On January 6, 1999, following jury deliberations, the jury found Defendant guilty on all counts charged. On March 1, 1999, Defendant's judgment of guilty conviction and sentence was filed.

On March 29, 1999, Defendant appealed. On appeal, Defendant argues the court erred (1) in failing to give a specific unanimity instruction concerning the manufacturing of methamphetamine under Count IV; (2) in denying her motion for judgment of acquittal because there was insufficient evidence to sustain the conviction for Count IV; and (3) in denying her motion in limine to exclude any evidence that she sold methamphetamine to finance her cocaine habit, although granting Junior's motion to exclude evidence that he sold crystal methamphetamine to a confidential informant.[12]

### III.

### A.

■ Defendant contends that the court's failure to give a specific unanimity instruction as to the manufacturing offense violated her substantial due process right to a unanimous jury verdict. The State first argues that Defendant waived any objection to the jury instructions and, therefore, she cannot raise it "for the first time in the instant appeal." However, an appellate court "may recognize plain error when the error committed affects substantial rights of the defen-

---

11. The prosecutor did note that there was an error in the verdict form for Count IV, which was not clearly articulated on the record. The prosecutor merely stated, "I think there was an error" and Defendant's counsel agreed that there was an error. When the court asked if there were any objections to the verdict forms, no counsel objected. This matter was not raised on appeal.

12. On appeal, Defendant challenges the court's ruling on her motion in limine No. 2 to exclude McCrocklin's testimony that Defendant was selling methamphetamine to finance her cocaine habit. She does not challenge the court's ruling and any testimony of McCrocklin related to Defendant's alleged manufacturing of cocaine.

dant[,]" and "[i]t may be plain error for a trial court to fail to give an ... instruction even when neither the prosecution nor the defendant have requested it ... because the ultimate responsibility properly to instruct the jury lies with the circuit court and not with the trial counsel." *State v. Kinnane*, 79 Hawai'i 46, 50, 897 P.2d 973, 977 (1995); *See also State v. Staley*, 91 Hawai'i 275, 282, 982 P.2d 904, 911 (1999) ("Plain error or defects affecting substantial rights may be noticed [by appellate courts] although they were not brought to the attention of the [lower] court."). If a specific unanimity instruction was required but not given, there would be plain error. *See Arceo*, 84 Hawai'i at 33, 928 P.2d at 875. Therefore, we must determine whether a specific unanimity instruction should have been issued on the manufacturing count.

### B.

In *Arceo*, the Hawai'i Supreme Court held that the following rule governed a defendant's constitutional right to a unanimous verdict:

> [W]hen separate and distinct culpable acts are subsumed within a single count ... — any one of which could support a conviction thereunder—and the defendant is ultimately convicted by a jury of the charged offense, the defendant's constitutional right to a unanimous verdict is violated unless one or both of the following occurs: (1) at or before the close of its case-in-chief, the prosecution is required to elect the specific act upon which it is relying to establish the "conduct" element of the charged offense;[13] or (2) the trial court gives the jury a specific unanimity instruction, i.e., an instruction that advises the jury that all

twelve of its members must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*Id.* at 32–33, 928 P.2d at 874–75.

There, the defendant was convicted of sexual assault in the first degree and sexual assault in the third degree. *Id.* at 2–3, 928 P.2d at 844–45. On appeal, the defendant argued *inter alia* that the circuit court erred in "refusing to require the prosecution 'to elect the specific acts upon which convictions ... were being sought' as to each count." *Id.* at 3, 928 P.2d at 845. The supreme court held that the multiple acts of alleged "sexual contact" as they pertained to Count I, sexual assault in the third degree, and the multiple acts of alleged "sexual penetration" as they pertained to Count 2, sexual assault in the first degree, could not be "continuing offenses" and "that each distinct act in violation of these statutes constitutes a separate offense under the [Hawai'i Penal Code]." *Id.* at 21, 928 P.2d at 863. Therefore, the supreme court vacated the judgment of conviction and on remand required the prosecutor to elect the incident of sexual abuse on which it was relying to prove the counts charged in the indictment or the trial court to give a specific unanimity instruction. *Id.* at 31–33, 928 P.2d at 873–75.

### IV.

Defendant contends McCrocklin's testimony demonstrated Defendant committed several separate and distinct acts of methamphetamine manufacturing—the placing of methamphetamine into a Pyrex dish several times, adding coconut flavoring to methamphetamine, and mixing different batches of methamphetamine. Thus, Defendant maintains the jury should have been instructed

---

13. The Hawai'i Supreme Court has held that the election need not be express. It has said that if there are two criminal episodes that could be deemed "separate and culpable acts," the prosecutor's focus upon one set of facts and lack of effort to develop the other set of facts, may constitute an effective prosecutorial election that satisfied the requirements of *State v. Arceo*, 84 Hawai'i 1, 928 P.2d 843 (1996). *See State v. Ortiz*, 91 Hawai'i 181, 981 P.2d 1127 (1999) (holding that although there were two distinct thefts of separate properties, a specific unanimity instruction was not required because the prose-

cutor focused on the facts of the first theft and made no effort to develop the facts related to the theft of the second residence); *State v. Maumalanga*, 90 Hawai'i 58, 63–64, 976 P.2d 372, 377–78 (1998) (holding that although there were two distinct episodes when the defendant transported a firearm, a specific unanimity instruction was not required because the prosecutor made an effective election to base its charge of place to keep loaded firearm on only one of the episodes).

In the present case, there was no express election by the prosecutor or an effort by the prosecutor to develop only one set of facts.

that all twelve members had to agree on which purported act of drug manufacturing constituted the offense under Count IV.

On the other hand, the State asserts that McCrocklin's testimony showed the "ongoing" nature of the manufacturing process and that "Defendant's activities [were] not susceptible to being characterized as readily identifiable or meaningful points of time or detail that mark either the beginning or ending of the manufacturing process."

We consider several factors in determining whether the unanimity rule applies to this case.

## V.

According to HRS § 712–1240 (Supp.1999), " '[m]anufacture' means to produce, prepare, compound, convert, or process a dangerous drug, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical conversion or synthesis." [14] In *Arceo*, the supreme court noted that HRS § 707–700 (1993), which applied there, expressly provided that "each act of sexual penetration shall constitute a separate offense." Unlike the statute in *Arceo*, we note that neither the language of HRS § 712–1240 nor the related commentary provide that the separate acts listed in the definition of "manufacture" constitute separate offenses.

## VI.

### 1.

Secondly, we note that, by its nature,[15] manufacturing of a dangerous drug may be a single continuous offense. The general character of "manufacturing" connotes a continuing "process" of various steps or stages. In its ordinary sense, "manufacture" is "the process or operation of making goods or any material produced by hand, by machinery or

by other agency," *Black's Law Dictionary* 964 (6th ed.1990), and the definition in HRS § 712–1240 is similar.

For example, in this case, when asked how long "the maturing of the methamphetamine was going on ... during the time [she] lived at the Hakimo Road address[,]" McCrocklin replied "Off and on the entire time I was there." McCrocklin recounted that the process for the methamphetamine to change from powder to rock took "[a] long time." Although McCrocklin testified Defendant placed methamphetamine into a Pyrex dish "[s]everal times," she was uncertain if the materials used by Defendant were "new products, old products or if it was an ongoing continuous thing." She did, however, recall that converting methamphetamine from powder to rock was "ongoing" for the whole period she lived at the residence, which was "almost three weeks." Thus, while the acts described by McCrocklin involved a process with identifiable stages, the process was one which was not terminated until the time of Defendant's arrest.

### 2.

This case is similar to *State v. Simonson*, 91 Wash.App. 874, 960 P.2d 955 (1998), *review denied*, 137 Wash.2d 1016, 978 P.2d 1098 (1999), where the Washington Court of Appeals held that the defendant's actions over a six-week period constituted a single *continuous offense of manufacturing* methamphetamine. In *Simonson*, the defendant was convicted *inter alia* of one count of manufacturing methamphetamine. *Id.* at 959. At trial, a witness testified that "[d]uring February and March 1996, [he] had been to the [defendant's] trailers and had seen [the defendant] manufacturing methamphetamine." *Id.* at 958. On appeal, the court of appeals stated in relevant part as follows:

---

**14.** The commentary accompanying HRS § 712–1240 stated, "The legislature found that the growing problem of manufacturing dangerous drugs in Hawai'i posed a significant problem...." Commentary to HRS § 712–1240 (Supp.1999) (citations omitted). Thus, "the offense of manufacturing a dangerous drug [was designated] a class A felony" for which was provided a mandatory minimum sentence." Senate

Stand. Comm. Rep. No. 770, in 1997 Senate Journal, at 1196; *see also* House Stand. Comm. Rep. No. 1651, in 1997 House Journal, at 1749–50.

**15.** "Nature" is defined as "a kind, sort, type, order; general character." *Black's Law Dictionary* 1027 (6th ed.1990).

A unanimity instruction is required, whether requested or not, when a jury could find from the evidence that the defendant committed a single charged offense on two or more distinct occasions.... A *jury cannot find that the defendant committed a single charged offense on two or more occasions, however, if the evidence shows only that the defendant committed a single continuing offense.*

*Id.* at 960 (emphasis added).

Because "the evidence ... show[ed] that [the defendant and his accomplice] were committing a continuing offense, manufacturing methamphetamine, over a six-week period of time," *id.,* the appellate court concluded a unanimity instruction was unnecessary because "there [was] no danger that some jurors would have found the occurrence of one crime while other jurors found the occurrence of a different crime." *Id.* at 961.

### VII.

Third, based on the evidence presented, the offense of manufacturing in this case can be construed as a continuing offense. In *Arceo,* the supreme court defined a "continuing offense" as

> a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy[, or] an offense which continues day by day[, or] a breach of the criminal law, not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences.

*State v. Temple,* 65 Haw. 261, 267 n. 6, 650 P.2d 1358, 1362 n. 6 (1982) (citation omitted). Put [another way],

> [t]he test to determine whether [a] defendant intended to commit more than one offense in the course of a criminal episode is *whether the evidence discloses one general intent or discloses separate and distinct intents. If there is but one intention, one general impulse, and one plan, there is but one offense.*

[*State v. ]Ganal,* 81 Hawai'i [358,] 379, 917 P.2d [370,] 391 [ (internal quotation marks and citation omitted) ].

*Arceo,* 84 Hawai'i at 18, 928 P.2d at 860.

The record here does not reflect that Defendant intended "to commit more than one offense [of manufacturing methamphetamine] in the course of a criminal episode." *Id.* (citations omitted). Irrespective of the time frame, the evidence does not show that each step "disclose[d] separate and distinct intents" on the part of Defendant to manufacture methamphetamine. *Id.* Rather, the evidence demonstrated that Defendant had "but one intention, one general impulse, and one [continuous] plan" to manufacture methamphetamine over the stated period of time for the purpose of financing her cocaine addiction.

### VIII.

Fourth, this was a simple and clear case in which the evidence demonstrated that manufacturing pertaining to the same drug occurred at the same place and for a continuous period of time preceding the arrest. The evidence did not direct the jury's attention to the production of drugs at different places or at different times. Thus, this case is unlike *Arceo,* where the prosecutor elicited evidence of separate acts of sexual assault, "each comprising a distinct instance of the same statutory offense[.]" *Id.* at 12, 928 P.2d at 854. There, the minor victim recounted at least seven "separate and distinct" acts of sexual assault by the defendant, involving different forms of touching and penetration. *Id.* at 4–5, 7–10, 928 P.2d at 846–47, 849–52.

### IX.

Fifth, to some extent, whether there is evidence that would support convictions for separate and distinct culpable acts depends on the manner in which the case is presented to the jury. As contrasted to the situation in *Arceo,* the prosecutor in the present case did not portray Defendant's conduct as comprising "separate and distinct culpable acts" of manufacturing methamphetamine nor emphasize any specific conduct upon which "the jury could find from the evidence that [De-

fendant] committed a single charged offense on two or more distinct occasions." *See id.* at 32–33, 928 P.2d at 874–75 (citations omitted); *Simonson,* 960 P.2d at 960. No argument was presented to the jury asserting that Defendant committed "separate and distinct culpable acts" of manufacturing methamphetamine.

Hence, there was "no danger [here] that some jurors would have found the occurrence of one crime while other jurors found the occurrence of a different crime" under the evidence adduced at trial. 960 P.2d at 961. The case here was "sufficiently simple and clear in its presentation that unanimity could be assumed based on the general unanimity instruction." *Arceo,* 84 Hawai'i at 32, 928 P.2d at 874 (citing *United States v. Payseno,* 782 F.2d 832, 836–37 (9th Cir.1986) (ruling that there was "the genuine possibility that some jurors may have believed [that the defendant] used extortionate means on one occasion while others may have believed that he was guilty of engaging in extortion at a different time and place")).

We conclude, then, that there was no "*genuine* possibility that the jurors were not unanimous as to the conduct for which Defendant was found culpable." *See id.* (emphasis added); *see also United States v. Gilley,* 836 F.2d 1206, 1211–13 (9th Cir.1988). Here, "a general unanimity instruction to the jury was adequate in light of the pattern of conduct offered as evidence of a single charged offense." *People v. Cooks,* 446 Mich. 503, 521 N.W.2d 275, 276 (1994).

## X.

■ Under the unanimity rule, the prosecutor must elect the specific act upon which reliance is placed "to establish the 'conduct' element of the charged offense" if evidence of "separate and distinct culpable acts" are presented in trial. *Arceo,* 84 Hawai'i at 33, 928 P.2d at 875. As a corollary to this aspect of the rule, we believe that the prosecution should designate and the court must thereafter instruct the jury on the specific conduct which constitutes a single continuous offense and upon which all members of the jury must agree in order to convict. Of course, no appealable dispute would arise were the trial courts in every case to instruct the jury that all of its members must unanimously agree to "the same underlying . . . act" or acts that constitute the conduct they find culpable under the charge, before they may find a defendant guilty.

## XI.

■ We next consider whether the court erred when it denied Defendant's December 30, 1998 acquittal motion as to Count IV and whether substantial evidence supported a conviction on this count.

When reviewing a motion for judgment of acquittal, [the appellate courts] employ the same standard that a trial court applies to such a motion, namely, whether, upon the evidence viewed in light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

*State v. Jhun,* 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996) (citing *State v. Alston,* 75 Haw. 517, 528, 865 P.2d 157, 164 (1994); *State v. Rocker,* 52 Haw. 336, 346; 475 P.2d 684, 690 (1970)). "[S]ufficient evidence to support a prima facie case requires substantial evidence as to every material element of the offense charged." *Id.* (citing *State v. Eastman,* 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996)) (internal quotation marks omitted). "Substantial evidence . . . is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (internal quotation marks omitted). Under such review, "'full play [is given] to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact.'" *Id.* (quoting *State v. Yabusaki,* 58 Haw. 404, 411, 570 P.2d 844, 848 (1977)).

With respect to the judgment of acquittal, we believe that there was sufficient evidence "to support a prima facie case [that Defendant manufactured methamphetamine] so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Id.* (citations omitted). The State's expert witness, Yamamoto, opined that a methamphetamine

conversion lab existed at Defendant's residence on June 13, 1998. Tangible items reflecting engagement in drug conversion such as methamphetamine, scales, Pyrex dishes, filter paper, and acetone, were recovered from the searched premises. McCrocklin's testimony revealed that Defendant continuously converted powdered methamphetamine into crystal methamphetamine at the Hakimo residence. Evidence of Defendant's knowing state of mind may be inferred from McCrocklin's testimony, including her disclosure that Defendant told her "[Defendant] was waiting for [the methamphetamine] to become a good product in order to sell it." "[B]ased on all of the evidence adduced at trial, the jury [can] infer that [Defendant] acted ... knowingly, because 'the mind of an alleged offender may be read from his [or her] acts, conduct and inferences fairly drawn from all the circumstance.' " *Id.* at 482, 927 P.2d at 1365 (quoting *Eastman,* 81 Hawaiʻi at 141, 913 P.2d at 67) (brackets omitted). Therefore, there was sufficient evidence to support a prima facie case of "every element of the offense charged" and the court correctly denied Defendant's acquittal motion. *Id.*

The foregoing evidence also amounted to substantial evidence "to enable a person of reasonable caution to support a conclusion" that Defendant manufactured methamphetamine. *Jhun,* 83 Hawaiʻi at 481, 927 P.2d at 1364. Hence, there was substantial evidence to support the conviction as to Count IV of the indictment.

## XII.

 Defendant contends that the State's witnesses failed to establish substantial evidence as to the date of the manufacturing of methamphetamine. "In general, [however,] the precise time and date of the commission of an offense is not regarded as a material element[,]" therefore, "it is sufficient, in the indictment, to allege that the offense occurred over a particular time span." *Arceo,* 84 Hawaiʻi at 13, 928 P.2d at

855. The instant indictment designated "on or about June 13, 1998" as the time span during which manufacturing occurred. McCrocklin's observations for three weeks prior to the search warrant execution, if believed, were sufficient to prove Defendant was engaged in manufacturing methamphetamine on or about June 13, 1998. Hence, the court was not wrong in denying Defendant's acquittal motion as to proof of the time of the offense.

## XIII.

 Our last inquiry is whether the court abused its discretion when it excluded evidence that Junior sold crystal methamphetamine to a confidential informant, but denied Defendant's motion to exclude evidence that she sold methamphetamine to finance her cocaine habit. "Since 'the granting or denying of a motion in limine is within the trial court's inherent power to exclude or admit evidence[,]' " we review the court's ruling for the abuse of discretion standard. *Meyer v. City and County of Honolulu,* 6 Haw.App. 505, 510 n. 8, 729 P.2d 388, 393 n. 8, *judgment aff'd in part, reversed in part,* 69 Haw. 8, 731 P.2d 149 (1986) (quoting *Lussier v. Mau-Van Dev., Inc. I,* 4 Haw.App. 359, 392, 667 P.2d 804, 826 (1983)) (brackets omitted). " 'The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.' " *State v. Furutani,* 76 Hawaiʻi 172, 179, 873 P.2d 51, 58 (1994) (quoting *Kaneohe Bay Cruises, Inc. v. Hirata,* 75 Haw. 250, 258, 861 P.2d 1, 6 (1993) (citations omitted)).

## A.

 Defendant argues that evidence as to Junior's sales to the confidential informant would have been probative of whether Junior had a motive to manufacture methamphetamine. The State argues that under Hawaiʻi Rules of Evidence (HRE) Rule 402 (1993),[16]

---

16. Hawaiʻi Rules of Evidence Rule 402 (1993), Relevant evidence generally admissible; irrelevant evidence inadmissible, states:

> All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawaii, by statute, by these rules, or by other rules

the court properly excluded such evidence because Junior's motive was irrelevant to whether Defendant was manufacturing methamphetamine. It appears Defendant's argument on appeal is that the court's decision to deny her motion in limine was inconsistent with its ruling on Junior's motion. Whether the court abused its discretion in granting Junior's motion in limine, however, would not affect our determination of the charges against Defendant. We are only concerned with the effect the court's decision had on the charge against Defendant. So long as the court did not abuse its discretion as to Defendant's motion, we cannot say in this appeal that it erred.

### B.

■ The court ruled that evidence of Defendant's sale of methamphetamine would be admitted "only ... in determining [D]efendant's motive, opportunity, or intent to possess the dangerous drug." It issued the following cautionary instruction to the jury:

> [D]uring the testimony of Bridgette McCrocklin you may have heard evidence that the defendants at another time may have committed other acts other than what's been charged in this case. Such evidence may be considered by you only on the issues of whether there was a motive, opportunity, intent or knowledge on the part of the defendants to commit the offenses charged in this case and for no other purpose.

adopted by the supreme court. Evidence

We conclude that the court did not abuse its discretion. Under HRE Rule 404(b) (Supp.1999), the court may admit evidence of other crimes, wrongs, or acts "where such evidence is probative of any other fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident[,]" provided that the HRE Rule 403 "balancing" test is met. Commentary to HRE Rule 404(b). Evidence that Defendant sold methamphetamine to finance her cocaine use is probative of whether Defendant had a motive to manufacture methamphetamine and her intent to do so. Defendant's cocaine use also demonstrated her knowledge of the nature of illegal drugs. Therefore, we cannot conclude that any potential prejudice, confusion, or waste of time outweighed the probative value of such testimony.

### XIV.

For the foregoing reasons, we affirm the court's March 1, 1999 judgment of guilty conviction and sentence as against Defendant.

which is not relevant is not admissible.