**Johnnie HAYES Appellant,**

v.

**COMMONWEALTH OF KENTUCKY Appellee,**

and

**John Paul Harrison Appellant,**

v.

**Commonwealth of Kentucky Appellee.**

No. 2003–SC–0675–MR,
2003–SC–0717–MR.

Supreme Court of Kentucky.

Oct. 20, 2005.

Dennis Allan Hardin, Bowling Green, Counsel for Appellant Johnnie Hayes (2003-SC-0675-MR).

Gregory D. Stumbo, Attorney General, Courtney J. Hightower, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee Commonwealth of Kentucky (2003-SC-0675-MR).

Emily Holt Rhorer, Department of Public Advocacy, Frankfort, Counsel for Appellant John Paul Harrison (2003-SC-0717-Mr).

Gregory D. Stumbo, Attorney General, Janine Coy Bowden, Assistant Attorney General, Frankfort, Counsel for Appellee Commonwealth of Kentucky (2003-SC-0717-MR).

Opinion of the Court by Justice COOPER.

Following a one-day trial by jury in the Grayson Circuit Court, Appellants, Johnnie Hayes and John Paul Harrison, were both convicted of manufacturing methamphetamine, KRS 218A.1432, and possession of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine. KRS 250.489(1); KRS 250.991(2). Each of the convictions for manufacturing methamphetamine was "firearm enhanced" to a Class A felony. KRS 218A.992. Hayes was sentenced to life in prison for his methamphetamine conviction and to fifteen years for his anhydrous ammonia conviction. Harrison was sentenced to twenty-five years for his methamphetamine conviction and to fifteen years for his anhydrous ammonia conviction. Harrison was also convicted of possession of drug paraphernalia, subsequent offense, KRS 218A.500(2),(5), and receiving stolen property valued at $300.00 or more,

KRS 514.110(1),(3), and was sentenced to five years each for those convictions. All of Harrison's sentences were ordered to run consecutively for a total of fifty years.

On appeal, Hayes asserts the following claims of reversible error: (1) the trial court's denial of his right to ascertain whether any prospective juror would be prejudiced against him if he exercised his Fifth Amendment right not to testify in his own defense (which he did); (2) the trial court's failure to grant his motion for a mistrial when the Commonwealth's first witness essentially informed the jury that Hayes was a convicted felon (which he was); (3) the Commonwealth's proof during the guilt phase of the trial that Appellant had been previously convicted of trafficking in a controlled substance in the first degree (methamphetamine); and (4) that KRS 250.489(1) is unconstitutionally vague because it does not define what is an unapproved container for anhydrous ammonia.

In addition to the voir dire issue, which he also preserved at trial, Harrison asserts the following additional claims of reversible error: (1) insufficiency of the evidence to support any of his convictions; (2) failure of the Commonwealth to prove a nexus between his alleged offenses and any of the firearms found on Hayes's property, thus permitting improper enhancement of his methamphetamine conviction; (3) the Commonwealth's proof during the guilt phase of the trial of his prior offense of possession of drug paraphernalia (for the purpose of enhancement); (4) the trial court's refusal to disqualify one of the prosecutors, an assistant Commonwealth's attorney who had served as the trial court's law clerk during the early stages of this litigation, including the suppression hearing; and (5) the trial court's refusal to grant his motion to suppress evidence seized during a warrantless search of the mobile home where the alleged drug paraphernalia and stolen property were found.

For the reasons explained in this opinion, we reverse Hayes's convictions and sentences and remand the charges against him for a new trial; we vacate Harrison's convictions and sentences for manufacturing methamphetamine, possession of anhydrous ammonia, and receiving stolen property; and we reverse Harrison's conviction and sentence for possession of drug paraphernalia and remand that charge for a new trial.

\* \* \* \* \* \*

On October 21, 2001, then Grayson County Sheriff Joe Brad Hudson received a tip that illegal drug activity was occurring on Johnnie Hayes's farm off Richland Road. Hudson and Tracy Moutardier, Hayes's probation officer, proceeded to the farm to investigate. The farm contained a dozen mobile homes (all referred to as "trailers"), some occupied, others used for storage, and others unused and in various states of disrepair. Hudson testified at the suppression hearing that he and Moutardier entered the farm over a bridge across a creek running between Richland Road and the farm, then over a graveled driveway that meanders in a circular route to Hayes's barn. Before reaching the barn, the driveway first passes what the Commonwealth repeatedly referred to at trial as the "John Paul trailer," where Harrison was alleged to have resided, and the "Martha Hayes trailer," where Johnnie Hayes's mother resided. At trial, Hudson's testimony in this respect was largely inaudible, but he seemed to indicate that he and Moutardier accessed the farm by another route. Nevertheless, upon reaching the barn, Hudson and Moutardier found Hayes and Harrison performing repairs on a garbage truck that Hayes used in his garbage disposal business. Hudson did not know Harrison but "got the im-

pression" that Harrison was employed by Hayes in the garbage disposal business. (At the suppression hearing, Moutardier testified that Harrison told her that he lived in Hardin County and was helping Hayes run his garbage route. Moutardier did not testify at trial.) When Hudson asked Hayes if he and Moutardier could search the property, Hayes responded: "Look anywhere you want; I own it all." There was no evidence that Harrison voiced an objection to this expansive invitation.

There was a locked "storage trailer" located across the driveway from the barn. At Hudson's request, Hayes produced the key to the storage trailer, which was found to contain sundry items of farm equipment and two unloaded firearms, one of which, a shotgun, was admitted into evidence at trial. Hudson testified at the suppression hearing that he also found an empty Sudafed box on the ground outside the storage trailer. At trial, he first testified that he found the empty box on the ground and, later, that he found it "at the [unspecified] residence." [1] Sudafed is a cold medication containing pseudoephedrine, a precursor used to manufacture methamphetamine. KRS 218A.1437(1).

Hudson and Moutardier proceeded further up the gravel driveway to a double-wide mobile home, the "Johnnie Hayes trailer," where Johnnie Hayes and his wife and children resided. Inside, they found and confiscated some personal effects, including several knives, shotgun shells, and prescription pill bottles. They then proceeded to the end of the driveway to the "Alcom trailer," the residence of Raymond Alcorn. They did not search this trailer. Instead, they proceeded along a pathway that led from the driveway through a wooded area and up a hill to the "meth trailer" near an area where Hayes was raising chickens. Hudson testified at the suppression hearing that he also saw horses and a donkey grazing in a pasture behind the meth trailer. There was evidence at trial that Emest Hudspeth owned the meth trailer.

Both the front and back doors of the meth trailer were padlocked. Upon detecting an ether-like odor emanating from an open window, Hudson crawled through the window into the trailer where be discovered a modified liquid propane (LP) gas tank containing anhydrous ammonia with a hose attached, a duffel bag containing "all of the ingredients necessary to manufacture methamphetamine," and a jar containing a liquid substance that was "cooking." Hudson exited the trailer through the same window and asked Hayes to produce all of the keys in his pockets. One key fit the padlock on the back door of the meth trailer. Hudson confiscated the duffel bag and the jar of liquid (later determined to contain methamphetamine), and arrested both Hayes and Harrison. A search of Harrison's person produced $340.00 in cash. Nothing in the record indicates that any keys or other items of personal property were found in Harrison's clothing or on his person.

The next day, October 22, Hudson and several deputy sheriffs returned to the Hayes farm. Upon discovering that the storage trailer was again locked, Hudson asked Hayes's wife for the key. Mrs. Hayes entered the Johnnie Hayes trailer and returned with a key ring. One of the keys on the ring fit the lock on the storage trailer; another fit the lock on the front

---

1. The Commonwealth's brief in Harrison's appeal mistakenly states that the Sudafed box was found in the "John Paul trailer." Appellee's brief, at 8. Hudson did not testify that a Sudafed box was found in that trailer. He did not even search the "John Paul trailer" until the next day, October 22, 2001.

door of the meth trailer. A further search of the area in the vicinity of the meth trailer revealed several "burn piles" containing the residue of items used in the process of manufacturing methamphetamine. In a wooded area behind the burn piles, they discovered a buried barrel covered by a piece of carpet. Inside the barrel were two LP gas tanks that had been modified for use as anhydrous ammonia containers, a length of hose, and a sawed-off shotgun wrapped in a bed sheet and bound with duct tape. There was no evidence that this weapon was loaded or that any shotgun shells were in the barrel. Nor was there any evidence that either of the LP tanks contained anhydrous ammonia or were emitting an ammonia-like odor.

Hudson then searched the "John Paul trailer," which was the trailer nearest to the entrance to the farm and farthest from the meth trailer, the burn piles, and the buried barrel. There was a motorcycle ("trail bike") behind the Harrison trailer that was later determined to have been stolen from Michael Clement. Inside the trailer, Hudson found a room with a table, a dresser, a sofa, and "his [presumably meaning Harrison's] personal belongings." There was a partially eaten sandwich and a glass of water on the table, and a box on the floor that contained a syringe, a tourniquet, needles, distilled water, alcohol, cotton swabs, band-aids, and scissors. Hudson testified that these items could be used for intravenous ingestion of methamphetamine, but he also admitted that each of these items had a legal use. On the dresser, Hudson found several prescription pill boxes with prescription labels containing Harrison's name. One pill box contained a white powder that he first thought was methamphetamine, but which was later determined to be nicotinamide, a vitamin B often used as a cutting agent for methamphetamine but also used as a food supplement both by humans and for livestock.

Inside the dresser, Hudson found a battery-powered light with a strap that could be worn around the top of a person's head, which he referred to as a "head lamp," and a pair of night-vision goggles. Hudson testified without objection that these items were "what they use when they go out at night and steal anhydrous ammonia." In a "junk room" inside the "John Paul trailer," Hudson discovered three LP gas tanks, one containing LP gas and the other two empty. None of these tanks had been modified for use as anhydrous ammonia containers, but they were of the same type and size as the modified tanks found in the meth trailer and in the barrel buried in the woods.

## I. VOIR DIRE.

The trial court conducted the initial voir dire of the jury panel, inquiring (1) whether any juror had a relationship with either defendant or with any of the attorneys that would cause that juror to be biased for or against the Commonwealth or the defendants; (2) whether any juror "had any problem" with the presumption of innocence; (3) whether any juror believed he or she would be incapable of reaching a decision in the case; (4) whether any juror considered certain types of witnesses, *e.g.*, police officers, to be more credible than others; (5) whether the jurors would agree to follow the court's instructions with respect to the law even if they disagreed with the law; (6) whether the jurors would agree to decide the defendants' guilt or innocence without worrying about what the punishment would be; (7) whether the jurors would agree to consider the entire range of punishments [but not specifying what the range would be, *see Lawson v. Commonwealth*, 53 S.W.3d 534, 544 (Ky.2001)]; and (8) whether any juror knew of anything that would make it

impossible for that juror to be fair to both the Commonwealth and the defense.

The prosecutor then questioned the jurors, after which counsel for Hayes began his voir dire. The following occurred when Hayes's counsel attempted to ascertain whether any juror would "hold it against" Hayes if he exercised his Fifth Amendment right not to testify:

COUNSEL: There's another constitutional principle that I want everybody to be aware of—the Fifth Amendment. The Fifth Amendment says that Mr. Hayes (interrupted)

JUDGE: [*sua sponte*] No. No. No.

COUNSEL: Did you say something, Judge?

JUDGE: [at side bar] If your clients do not testify, I'll put in the instructions his right to remain silent; but I'm not going to let you say that, then turn around and call them to the witness stand, then say, "Folks, they didn't have to testify, but they did; they took the stand and that proves they didn't have nothing to hide." We're not going to play that game. Be quiet about it now and I'll address it in the instructions, whichever is right.

COUNSEL: I believe that I'm entitled to probe this jury to find out if anybody would hold it against Mr. Hayes if he decides not to take the stand, because, more often than not, in my experience, that question typically elicits responses on which strikes for cause are based.

JUDGE: I've seen it the other way too much and if you argue that and he takes the stand you're in a position to argue that he didn't have to take the stand but he did, which proves his innocence. I won't let [the prosecutor] say, "He didn't take the stand and therefore he's guilty." Now, I'll put it in the instruction that the fact that he did not take the stand, that no presumption is to be drawn against him for the fact that he did not testify—but I won't let you go into it right now.

COUNSEL: Your honor, I understand what you're saying. I respectfully disagree with you, though. If I take that position now and then put him on the stand, and then if I attempt to say that, at that point, it would be right for [the prosecutor] to object.

JUDGE: Do you have some law?

COUNSEL: My law is the Fifth Amendment of the Constitution.

PROSECUTOR: I think we're running over plowed ground. The Court has already asked them if they will follow your instructions. You did. If they don't testify, the paragraph will be there and that's it.

COUNSEL: I strenuously and vigorously object to not being allowed to probe this jury as to whether they hold opinions about my client taking the stand or not taking the stand.

JUDGE: [to prosecutor] Do you object?

PROSECUTOR: Yes.

JUDGE: Objection sustained. I'm going to address that in the instructions. Lewis [counsel for Harrison], do you want to join in the objection?

COUNSEL FOR HARRISON: Yes, I will join in the objection.

JUDGE: Overruled.

Counsel for Hayes then stated on the record that the questions he wished to ask were: (1) Does everybody understand that, because he's presumed innocent, he doesn't have to take the stand in his own behalf? (2) Would anybody hold it against him if he does not take the stand in this trial? and (3) any follow-up questions de-

pending upon the responses to the first two questions.

Criminal Rule (RCr) 9.38 provides as follows with respect to voir dire during criminal trials in which the Commonwealth does not seek the death penalty:

> The court may permit the attorney for the Commonwealth and the defendant or the defendant's attorney to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the attorney for the Commonwealth and the defendant or the defendant's attorney to supplement the examination by such further inquiry as it deems proper. The court may itself submit to the prospective jurors such additional questions submitted by the parties or their attorneys as it deems proper.

Neither Hayes nor Harrison testified at trial. The trial court included a "no adverse inference" instruction in the jury instructions identical to the specimen instruction at 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 2.04A (4th ed.1999).

■ The Fifth Amendment to the United States Constitution affords a criminal defendant the right not to testify at his own trial; and the Sixth Amendment entitles him to an impartial jury that will not be adversely influenced by the fact that he exercised that constitutional right. *Carter v. Kentucky*, 450 U.S. 288, 305, 101 S.Ct. 1112, 1121–22, 67 L.Ed.2d 241 (1981). "[T]oo many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are ... guilty of crime ...." *Ullmann v. United States*, 350 U.S. 422, 426, 76 S.Ct. 497, 500, 100 L.Ed. 511 (1956). "[A] state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary

weight to a defendant's failure to testify." *Carter*, 450 U.S. at 305, 101 S.Ct. at 1121–22.

■ While it is within the discretion of the trial court to limit the scope of voir dire, that discretion is not boundless. Appellate review of such limitation is for abuse of discretion. *Webb v. Commonwealth*, 314 S.W.2d 543, 545 (Ky.1958) (trial court abused discretion by not permitting defendant being tried for the murder of his father to examine jurors on their views concerning patricide and self-defense). However, "[t]o be constitutionally compelled ... it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min v. Virginia*, 500 U.S. 415, 425–26, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493 (1991). The test for abuse of discretion in this respect is whether an anticipated response to the precluded question would afford the basis for a peremptory challenge or a challenge for cause.

> The voir dire examination plays a critical role in securing the right to an impartial jury. The principal purpose of voir dire is to probe each prospective juror's state of mind and to enable the trial judge to determine actual bias and to allow counsel to assess suspected bias or prejudice. Thus, a voir dire examination must be conducted in a manner that allows the parties to effectively and intelligently exercise their right to peremptory challenges and challenges for cause.

*Thomas v. Commonwealth*, 864 S.W.2d 252, 259 (Ky.1993) (internal citation and quotation omitted). *See also United States v. Barnes*, 604 F.2d 121, 142 (2d Cir.1979) ("[T]here must be sufficient information elicited on Voir dire to permit a defendant to intelligently exercise not only

his challenges for cause, but also his peremptory challenges ...."); *United States v. Blount*, 479 F.2d 650, 651 (6th Cir.1973) (trial court abused discretion by not permitting defense counsel to inquire whether jurors believed in the presumption of innocence);[2] *cf. United States v. Aloi*, 9 F.3d 438, 441 (6th Cir.1993) (no abuse of discretion because the answer to the precluded question would not have provided grounds for a challenge for cause).[3]

[P]art of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors.... *Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able to impartially follow the court's instructions and evaluate the evidence cannot be fulfilled. Hence, the exercise of [the trial court's] discretion,

and the restriction upon inquiries at the request of counsel [are] subject to the essential demands of fairness.

*Morgan v. Illinois*, 504 U.S. 719, 729–30, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992) (internal citations and quotations omitted).

■■■ It is reversible error for a trial court to refuse to excuse for cause a juror who would be prejudiced against the defendant because he did not testify in his own behalf.[4] *Humble v. Commonwealth*, 887 S.W.2d 567, 569–71 (Ky.App.1994) (juror who said he could find the defendant not guilty if he failed to testify and the Commonwealth failed to prove its case "but it would be tough"). *See also State v. Cross*, 658 So.2d 683, 687–88 (La.1995) (juror who stated he would not afford defendant the presumption of innocence if he did not take the stand); *State v. Scott*, 482 S.W.2d 727, 732–33 (Mo.1972) (en banc) (juror who said if defendant did not avail himself of his opportunity to testify he

**2.** The dissent suggests that our citation to *Blount* is improper because other federal circuit courts of appeal have declined to follow its holding. *Post*, at 597. However, *Blount* has never been overruled and its holding has been cited with approval by the Sixth Circuit Court of Appeals on a number of occasions. *Miller v. Francis*, 269 F.3d 609, 615 (6th Cir.2001); *United States v. Hill*, 738 F.2d 152, 153 (6th Cir.1984); *United States v. Johnson*, 584 F.2d 148, 155 (6th Cir.1978); *United States v. Anderson*, 562 F.2d 394, 397–98 (6th Cir.1977).

**3.** The dissent erroneously suggests that *Aloi* departed from the holding in *Blount*. *Post*, at 597–98. In fact, *Aloi* reaffirmed *Blount* but held that the disputed question would not have elicited information leading to a challenge for cause.

The specific question asked here, namely, the jurors' "knowledge" of a defendant's right not to testify, would not itself be a ground for a challenge for cause. Only if after being instructed that the defendant's failure to testify could not be held against

him and the refusal or inability to comply with that instruction, could they be challenged for cause.

*Aloi*, 9 F.3d at 441. Obviously, the last sentence does not mean that jurors must be challenged for cause only after they are instructed at the conclusion of the case. The apparent problem in *Aloi* was that trial counsel did not request the court to instruct the jury during voir dire that the defendant's failure to testify could not be held against him, thus enabling inquiry into whether the jurors could comply with that instruction.

**4.** The dissent questions our citation to the immediately following authorities because they are "cases where prospective jurors indicated that they would likely draw an adverse inference against the defendant failing to testify." In fact, they are cited precisely for the principle that such indications would require that they be struck for cause. How could trial counsel determine whether jurors would likely draw an adverse inference against the defendant's failure to testify unless allowed to make the inquiry prior to the impaneling of the jury?

would consider that fact and hold it against him); *People v. Bludson,* 97 N.Y.2d 644, 736 N.Y.S.2d 289, 761 N.E.2d 1016, 1018 (2001) (juror who stated that defendant's failure to testify might influence his decision and "make it a little hard for [him] to * * * say that [defendant was] not guilty"); *State v. Hightower,* 331 N.C. 636, 417 S.E.2d 237, 240 (1992) (juror who said on one occasion that he could follow the law as given to him by the court but then said that the defendant's failure to testify would "stick in the back of my mind" while he was deliberating). The Supreme Court of Hawaii has held in two cases that post-trial evidence that a juror knowingly concealed during voir dire a bias against defendants who failed to testify or present evidence of their innocence is grounds for a new trial. *State v. Furutani,* 76 Hawaii 172, 873 P.2d 51, 63–64 (1994); *State v. Sugiyama,* 71 Haw. 389, 791 P.2d 1266, 1267 (1990). We need not decide whether RCr 10.04 might preclude such evidence in Kentucky. The principle, however, is the same. A criminal defendant is entitled to a trial by jurors who will not be prejudiced by the fact that the defendant exercised the Fifth Amendment privilege not to testify.

> The principle that a defendant's failure to testify in his own behalf cannot be held against him is perhaps the most critical guarantee under our criminal process, and it is vital to the selection of a fair and impartial jury that a juror understand this concept.

*People v. Boswell,* 132 Ill.App.3d 52, 87 Ill.Dec. 162, 476 N.E.2d 1154, 1157 (1985), *rev'd on other grounds,* 111 Ill.2d 571, 94 Ill.Dec. 447, 488 N.E.2d 273 (1986).

▆▆▆▆ If any jurors who sat in judgment of Hayes and Harrison had expressed such a prejudice, the trial court would have been required to strike those jurors for cause. But how could defense counsel identify jurors holding such prejudice if defense counsel is precluded from making the relevant inquiry on voir dire? By limiting the voir dire to exclude any inquiry into that issue on the notion that to do so might give the defendants an unfair advantage during closing arguments, the trial court prevented them from identifying any jurors so prejudiced and thereby precluded the exercise of possible challenges for cause and interfered with the intelligent exercise of peremptory strikes. It is immaterial that the jurors did not "have any problem" with the presumption of innocence and agreed to follow the court's instructions—especially when they were not told that one of those instructions would be that they should draw no adverse inference from the defendants' failure to testify. Nor was the error cured by the fact that the trial court included a "no adverse inference" instruction in the jury instructions. *See Hightower,* 417 S.E.2d at 240 (juror who stated he could follow the law as given by the court would, nevertheless, give adverse inference to defendant's failure to testify). "[A]dmonitions and instructions are no substitute for interrogation." *People v. Starks,* 169 Ill. App.3d 588, 120 Ill.Dec. 72, 523 N.E.2d 983, 988 (1988). "[E]ven if the judge had specifically advised the venire members that no adverse inference should be drawn from defendant's failure to testify, the absence of any ensuing inquiry as to their willingness to abide by that rule would not have constituted the requisite interrogation on the subject." *Id.* at 989.

> This Court has specifically rejected the contention that unjustified restrictions on voir dire can be cured by a response on the part of the prospective juror that he will follow the law as given him by the judge when the juror is unaware of the complexity of the law and where that law involves such a basic right of the defendant.

*State v. Lee*, 559 So.2d 1310, 1316 (La. 1990). As stated by the Supreme Court of Illinois:

[E]ssential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect.... [E]ach of these questions goes to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury .... The refusal to ask the questions resulted in prejudicial error which required reversal of the judgment.

*People v. Zehr*, 103 Ill.2d 472, 83 Ill.Dec. 128, 469 N.E.2d 1062, 1063–64 (1984) (internal citations and quotations omitted).

■ The evidence against Hayes was overwhelming; the evidence against Harrison was substantially less compelling. Regardless, the failure to permit counsel to ascertain during voir dire whether any of the prospective jurors would hold against them the fact that they exercised their Fifth Amendment privilege not to testify was an abuse of discretion that denied Hayes and Harrison their fundamental right to a fair and impartial jury, an error that is not subject to harmless error analysis. *Oswald v. Bertrand*, 374 F.3d 475, 482 (7th Cir.2004) ("Even a clearly guilty criminal is entitled to be tried before an impartial tribunal .... It is one of the handful of rights of a criminal defendant that is not subject to harmless error.")[5] *cert. denied*, 543 U.S. 1002, 125 S.Ct. 609, 160 L.Ed.2d 461 (2004). Both are entitled to a new trial.

■ Hayes also claims that the trial court *sua sponte* precluded him from informing the prospective jurors on voir dire that the Commonwealth's burden of proof in a criminal case is "beyond a reasonable doubt" and inquiring whether the jurors would hold the Commonwealth to that burden of proof. Despite defense counsel's assurance to the court that he did not intend to attempt to define reasonable doubt, the trial court expressed its belief that any mention of "reasonable doubt" in voir dire or opening statement would violate the holding of *Commonwealth v. Callahan*, 675 S.W.2d 391, 393 (Ky.1984), *i.e.*, that "trial courts shall prohibit counsel from *any* definition of 'reasonable doubt' at any point in the trial." We would not reverse on this issue because the trial court interrupted counsel before he could

5. The dissent professes to find this quotation "troubling," apparently because the United States Supreme Court has not yet so held. *Post*, at 598. In fact, the United States Supreme Court has yet to consider this issue, declining the opportunity to do so most recently in *Oswald*. It has, however, held in the face of a similar "harmless error" argument (*i.e.*, that the defendant was obviously guilty) that the Fourteenth Amendment protects a defendant from being tried by a judge who has an interest in the outcome. *Tumey v. Ohio*, 273 U.S. 510, 523, 534, 47 S.Ct. 437, 441, 445, 71 L.Ed. 749 (1927). We are not convinced that the Court would reach a contrary conclusion if the defendant were tried by a judge or jury who professed a refusal to afford the defendant his constitutional rights. The Seventh Circuit Court of Appeals has recently reaffirmed its holding in *Oswald* in the context of a prison disciplinary hearing. *Daher v. Vannatta*, 118 Fed.Appx. 981, 984 (7th Cir.2004) (though finding that there was no evidence that the tribunal was unfair and not impartial). *See also Giano v. Sullivan*, 709 F.Supp. 1209, 1217 (S.D.N.Y.1989) ("The right to a trial before an impartial judge or tribunal is one such fundamental right not subject to harmless error analysis.").

state his question to the jury, and counsel did not state on the record exactly what he intended to say or ask (as he later did when the trial court precluded him from asking the jurors if they would be prejudiced against his client if he did not testify). However, we note in passing that it is proper to inform jurors during voir dire that the Commonwealth's burden of proof is "beyond a reasonable doubt," *Zehr*, 83 Ill.Dec. 128, 469 N.E.2d at 1063–64, and to inquire of jurors whether they will hold the Commonwealth to that burden in this particular case—so long as no attempt is made to define that concept. Contrary to the trial court's statement on the record, the Comment to 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 2.02 does not state otherwise.

We will address other issues raised on appeal that are likely to recur on retrial. *Springer v. Commonwealth*, 998 S.W.2d 439, 445 (Ky.1999).

## II. OTHER ERRORS ASSERTED BY HAYES.

### A. EVIDENCE OF PRIOR CONVICTION.

This issue arose when counsel for Hayes elicited evidence during cross-examination of Sheriff Hudson that, in his experience of investigating fifty to sixty methamphetamine cases, only ten to fifteen percent of methamphetamine manufacturers do not also "use" (ingest) methamphetamine, and that methamphetamine users possess certain physical characteristics, *i.e.*, "bugs ... skinny." Counsel then asked Hayes to stand (for the jury to better observe that he is not skinny). The trial court *sua sponte* interrupted and directed the attorneys to approach the bench. The court

informed counsel for Hayes that he had introduced improper character evidence and gave counsel a choice of accepting either an admonition to the jury to disregard the evidence or the admission as rebuttal character evidence, KRE 404(a)(1), Hayes's recent conviction of trafficking in a controlled substance in the first degree (methamphetamine). Defense counsel refused to make this Hobson's choice and the trial court allowed the Commonwealth to inform the jury that on July 11, 2003, five days before this trial, Hayes was convicted by judgment of the Ohio Circuit Court of trafficking in a controlled substance in the first degree (methamphetamine) *for an offense that occurred on September 4, 2001*, less than two months prior to the offenses for which he was presently being tried.[6]

The first issue is whether the prior conviction was inadmissible because it was not final at the time it was introduced as evidence in this case. This Court recently held that the non-finality of a prior conviction does not preclude its admission as evidence in the subsequent trial of another criminal offense. *St. Clair v. Commonwealth*, 140 S.W.3d 510, 570 (Ky.2004), *overruling Thompson v. Commonwealth*, 862 S.W.2d 871 (Ky.1993). *St. Clair*, of course, changed the law after the commission of the crimes for which Hayes and Harrison were standing trial. (In fact, it changed the law after Hayes and Harrison were convicted—if *Thompson*, which was then the law, had been applied, the evidence would have been excluded.) A retrospective application of such a change might implicate the Ex Post Facto Clause or the "fair warning" aspect of the Fifth Amendment, *see Rogers v. Tennessee*, 532 U.S. 451, 460–62, 121 S.Ct. 1693, 1699–1700, 149 L.Ed.2d 697 (2001), if the change

6. Coincidentally, the indictment in the Ohio Circuit Court case charged Hayes with trafficking "either alone or in complicity with Ernest Hudspeth." Remember, Hudspeth was the owner of the "meth trailer."

lowered the quantum of proof, *i.e.*, sufficiency of the evidence necessary to sustain a conviction, or increased the punishment therefor. *See Carmell v. Texas*, 529 U.S. 513, 542–47, 120 S.Ct. 1620, 1638–40, 146 L.Ed.2d 577 (2000), *abrogating Murphy v. Commonwealth*, 652 S.W.2d 69, 72–73 (Ky. 1983). However, no such implication arises when, as here, the change affects only the competency, not the quantum, of evidence offered against a defendant. *Hopt v. Utah*, 110 U.S. 574, 589, 4 S.Ct. 202, 209–10, 28 L.Ed. 262 (1884) (retrospective application of repeal of statute declaring felons incompetent to testify); *see also Thompson v. Missouri*, 171 U.S. 380, 386–87, 18 S.Ct. 922, 924, 43 L.Ed. 204 (1898) (retrospective application of statute permitting introduction of previously inadmissible evidence authenticating handwriting); *Frazier v. Huffman*, 343 F.3d 780, 801 (6th Cir.2003) (retrospective application of amendment of Ohio Rule of Evidence 410).

■■■ Evidence that persons who use methamphetamine are usually skinny and that eighty-five to ninety percent of manufacturers of methamphetamine are users of their product, is a type of character evidence often referred to as "profile evidence." The jury could infer from such evidence that because Hayes is not skinny, there is a high degree of probability that he is not a manufacturer of methamphetamine. While profile evidence can be used to justify an investigative stop by law enforcement officials, *United States v. Sokolow*, 490 U.S. 1, 8, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989), such evidence "is inadmissible in criminal cases to prove either guilt or innocence." *Dyer v. Commonwealth*, 816 S.W.2d 647, 652 (Ky.1991), *overruled on other grounds by Baker v. Commonwealth*, 973 S.W.2d 54, 55 (Ky. 1998). *See also Tungate v. Commonwealth*, 901 S.W.2d 41, 43 (Ky.1995); *Pen-*

*dleton v. Commonwealth*, 685 S.W.2d 549, 553 (Ky.1985). This evidence is akin to that condemned in *Johnson v. Commonwealth*, 885 S.W.2d 951, 953 (Ky.1994) (coal truck drivers make it a practice to run red lights while blowing their horns, implying that defendant, a coal truck driver, did the same on the occasion in question).

■■■ However, the trial court erred in concluding that a prior conviction is admissible as rebuttal character evidence. Character evidence is admissible only in the form of reputation or opinion, not specific instances of conduct when, as here, character is not an essential element of a charge, claim, or defense. KRE 405; *Metcalf v. Commonwealth*, 158 S.W.3d 740, 745 (Ky.2005); *Purcell v. Commonwealth*, 149 S.W.3d 382, 399 (Ky.2004); Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.20[4], at 116 (4th ed. LexisNexis 2003) ("By providing only for the use of reputation or opinion evidence in this situation, the rule plainly implies a prohibition on evidence of particular acts of conduct."). Evidence of a prior conviction is evidence of a particular act of misconduct. The fact of a prior conviction can be admitted for impeachment purposes under KRE 405(b) (during cross-examination of a character witness) or 609(a) (to impeach the credibility of any witness); however, it is inadmissible to prove the bad character of the person convicted.

■■■ Nevertheless, evidence of Hayes's prior conviction was admissible to prove his motive, intent, and plan to manufacture methamphetamine. KRE 404(b); *Fulcher v. Commonwealth*, 149 S.W.3d 363, 379 (Ky.2004) (evidence that defendant participated in manufacturing methamphetamine only two days before charged offense admissible to refute claim that he was "framed;" and evidence that he ingested methamphetamine admissible to prove motive to manufacture same); *Howard v. Commonwealth*, 787 S.W.2d 264, 266 (Ky.

App.1990) (evidence that defendant sold pound of marijuana to undercover policeman four months after the charged offense admissible to prove plan). *See also United States v. Harris,* 293 F.3d 970, 976 (6th Cir.2002) (prior conviction of drug trafficking admissible to prove intent and knowledge in trial for distribution of crack cocaine); *United States v. Rush,* 240 F.3d 729, 731 (8th Cir.2001) (prior conviction of possession of amphetamine admissible to prove motive in trial for conspiracy to manufacture and distribute methamphetamine); *State v. Kealoha,* 95 Hawaii 365, 22 P.3d 1012, 1027 (2000) (evidence that defendant sold methamphetamine to finance cocaine habit admissible to prove motive and intent to manufacture methamphetamine). Thus, the trial judge's decision to admit this evidence was correct, though for the wrong reason. *Noel v. Commonwealth,* 76 S.W.3d 923, 929 (Ky. 2002); *Tamme v. Commonwealth,* 973 S.W.2d 13, 31 (Ky.1998); *Jarvis v. Commonwealth,* 960 S.W.2d 466, 469 (Ky.1998); *Smith v. Commonwealth,* 788 S.W.2d 266, 268 (Ky.1990).

### B. DENIAL OF MOTION FOR MISTRIAL.

This issue arose when Hudson testified that upon discovery of the firearms in the storage shed, Moutardier advised Hayes that he was not allowed to have guns in his possession, implying that he was a convicted felon (which he was). The trial court recognized the impropriety of this evidence and admonished the jury to disregard it. We assume it will not recur at retrial. In fact, Moutardier did not testify at trial and we know of no reason why the jury should even be informed that she was a probation and parole officer.

### C. CONSTITUTIONALITY OF KRS 250.489.

 We decline to address this issue because it was not raised in the trial court

and notice was not given to the attorney general. KRS 418.075(1) ("In any proceeding which involves the validity of a statute, the Attorney General of the state shall, *before judgment is entered,* be served . . . ." (emphasis added)); CR 24.03; *Maney v. Mary Chiles Hosp.,* 785 S.W.2d 480, 481 (Ky.1990) (KRS 418.075 is mandatory and will be strictly enforced); *Jacobs v. Commonwealth,* 947 S.W.2d 416, 419 (Ky.App.1997) (notice requirement applies in criminal as well as civil actions). We note in passing that while this Court has yet to address this issue, the Court of Appeals has addressed it and has upheld the constitutionality of the statute. *Commonwealth v. Kerr,* 136 S.W.3d 783 (Ky. App.2004).

### III. OTHER ERRORS ASSERTED BY HARRISON.

### A. SUFFICIENCY OF THE EVIDENCE.

*1. Manufacturing methamphetamine and possession of anhydrous ammonia in an unapproved container.*

 Harrison did not own the "meth trailer." The meth trailer was padlocked front and back, and Harrison was not found to possess a key to either lock. He was nowhere near the trailer when Hudson and Moutardier arrived at the Hayes farm, but was assisting Hayes in the repair of a garbage truck. There was no evidence that he had ever been inside the trailer, *e.g.,* no evidence that his fingerprints or any personal belongings were found in the trailer. No anhydrous ammonia or any other chemicals or equipment necessary to manufacture methamphetamine were otherwise found in his personal or constructive possession. While Harrison also contends there was no evidence

that he even resided on the Hayes farm, the presence in the "John Paul trailer" of his personal effects, pill bottles with his name on the labels, and a partially eaten sandwich sufficed to circumstantially prove that he at least occupied that trailer. Nevertheless, no anhydrous ammonia or other chemicals or equipment necessary to manufacture methamphetamine were found in the trailer; and the meth trailer, the burn piles, and the buried barrel were all found on top of a hill, at least 300 to 400 feet distant from and not visible from the "John Paul trailer."

Harrison correctly asserts that his mere presence on the property where the meth trailer was found is insufficient to support his convictions of manufacturing the methamphetamine and possession of the anhydrous ammonia found in the meth trailer. *Houston v. Commonwealth,* 975 S.W.2d 925, 929 (Ky.1998) ("[O]ne's mere presence at the scene of a crime is not evidence that such one committed it or aided in its commission.") (quoting *Rose v. Commonwealth,* 385 S.W.2d 202, 204 (Ky. 1964)). *See also Moore v. Commonwealth,* 282 S.W.2d 613, 615 (Ky.1955); *Allen v. Commonwealth,* 303 Ky. 783, 199 S.W.2d 453, 454 (1947); *English v. Commonwealth,* 240 Ky. 446, 42 S.W.2d 706, 707 (1931). Likewise, mere knowledge that a crime is occurring is insufficient to support a conviction of that crime, *Dowdle v. Commonwealth,* 554 S.W.2d 92, 94 (Ky.App. 1977), as is mere association with the persons involved at the time of its commission. *Moore,* 282 S.W.2d at 614. Even mere ownership of the property on which contraband is found is insufficient to sustain a conviction. *Franklin v. Commonwealth,* 490 S.W.2d 148, 149–50 (Ky.1972). A true

criminal must be distinguished from a mere ordinary "bystander." *United States v. Windom,* 19 F.3d 1190, 1200 (7th Cir. 1994). *See also Arellanes v. United States,* 302 F.2d 603, 606 (9th Cir.1962) ("mere proximity to the drug[s], mere presence on the property where [they are] located, or mere association, without more, with the person who does control the drug[s] or the property on which [they are] found, is insufficient to support a finding of possession."). Applying these principles, it was "clearly unreasonable for the jurors to find" beyond a reasonable doubt that Harrison either manufactured the methamphetamine or possessed the anhydrous ammonia in the meth trailer. *Cf. Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

The Commonwealth's primary argument at trial was that the evidence sufficed to convict Harrison as an accomplice with respect to the methamphetamine and anhydrous ammonia offenses, and the trial court's instructions permitted the jury to find him guilty either as principal or accomplice with respect to both offenses. The verdict form did not require the jury to identify under which theory guilt was found and the verdict did not so state.[7] The accomplice theory was premised upon a pyramid of inferences, *i.e.,* the jury could infer (1) that Harrison occupied the "John Paul trailer" and possessed the property found therein from the presence of his personal effects and the pill bottles with his name on the labels; (2) that Harrison used the head lamp and night-vision goggles to steal the anhydrous ammonia found in the meth trailer; (3) that the nicotinamide found in one of the pill bottles in the "John Paul trailer" was used to "cut" the

---

7. Harrison did not object to these instructions on grounds that they denied him his right to unanimous verdicts. *See Boulder v. Commonwealth,* 610 S.W.2d 615, 617 (Ky.1980) (instruction allowing conviction based on intentional or wanton conduct violated right to unanimous verdict where there was no evidence that defendant acted wantonly).

methamphetamine manufactured by Hayes for purpose of sale; and (4) that the $324.00 found in Harrison's pocket represented proceeds of such a sale.

We agree that the presence of Harrison's personal effects and the pill boxes with his name on the labels created a reasonable inference that Harrison occupied the "John Paul trailer" and possessed its contents. However, to support an inference that Harrison used the head lamp and night-vision goggles to steal the anhydrous ammonia found in the meth trailer, the Commonwealth was required to prove by direct or circumstantial evidence that the anhydrous ammonia found in the meth trailer had, in fact, been stolen. There was no direct evidence to prove that fact. "The corpus delicti may be shown by circumstantial evidence but the circumstances must be more consistent with guilt than with innocence." *Dolan v. Commonwealth*, 468 S.W.2d 277, 282 (Ky.1971). The evidence must constitute more than mere suspicion. *Matthews v. Commonwealth*, 481 S.W.2d 647, 648–49 (Ky.1972); *Hodges v. Commonwealth*, 473 S.W.2d 811, 812 (Ky.1971). Sheriff Hudson testified that a farmer can legally purchase anhydrous ammonia from a farm supply store by producing a "farm card" authorizing such a purchase. It is unknown whether Hayes owned a "farm card;" however, it is known that he owned a farm. The fact that the anhydrous ammonia was in a modified LP gas tank does not prove that it was stolen. Hayes could have purchased the anhydrous ammonia, then transferred it to the smaller tank for easier handling during the manufacturing process. *See generally Fulcher*, 149 S.W.3d at 368–69 (describing one method of manufacturing

methamphetamine: "Anhydrous ammonia is then funneled into the mixture from, typically, a propane tank through a plastic tube or rubber hose."). The three unmodified propane tanks found in the "junk room" of the "John Paul trailer" contribute nothing to this theory of complicity liability. None of these tanks was capable of being used as a container for anhydrous ammonia. One, in fact, contained propane, a gas commonly used for a number of purposes on farms.[8] Even if a jury believed that Harrison intended to modify those tanks at some future time, such would not prove present complicity in the manufacturing process then occurring in the meth trailer, or even create an inference that he modified the LP tank being used in the meth trailer.

The presence of the syringe, needles, tourniquet, etc., in the "John Paul trailer" created an inference that Harrison was a user of some type of intravenously injectable drug, perhaps methamphetamine (no controlled substance was found in the trailer and the paraphernalia found in the box on the floor was not tested for the presence of drugs). The chemist who identified the white powder as a "cutting agent" explained that if one gram of methamphetamine is mixed with one gram of nicotinamide, the result is two grams of methamphetamine. If that assertion is true (and the jury received no other definition of a "cutting agent"), possession of the small amount of nicotinamide found in the pill box with Harrison's name on the label would be more consistent with possession for personal consumption than possession for purpose of sale. *See United States v. Martinez*, 44 F.3d 148, 150 (2d Cir.1995)

8. *See* Latent Semantic Analysis, Texts on Energy Sources, *Propane*, University of Colorado at Boulder, *at* http://lsa.colorado.edu/essence/texts/propane.htm (last visited June 24, 2005); Venoco, Inc., *Propane, at* http://www.venocoinc.com/community/learning/interpropane.pdf (last visited June 24, 2005); Amerigas, *About Propane, at* http://www.amerigas.com/about_propane.htm (last visited June 24, 2005).

592

(cutting agent possessed by defendant "was ... not shown by any evidence to be more consistent with distribution than with purchase and use."), *vacated and superseded on other grounds by United States v. Martinez*, 54 F.3d 1040, 1044 (2d Cir.1995).

With respect to the $340.00 found on Harrison's person at the time of his arrest, we agree that possession of cash can be relevant to prove that a defendant is a drug trafficker. *United States v. Caraza*, 843 F.2d 432, 436 (11th Cir.1988) ("The combination of the currency, cocaine, and cocaine wrappers tends to demonstrate that [a defendant] was involved in a conspiracy to traffic in cocaine."); *United States v. Gonzalez*, 922 F.2d 1044, 1056 (2d Cir.1991); *United States v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir.1975) (possession of unexplained $967,450 in cash coupled with evidence of narcotics trafficking on a large scale "is similar to the possession of special means, such as tools or apparatus, which is admissible to show the doing of an act requiring those means."). However, possession of cash alone is insufficient to indicate criminality. *Clay v. Commonwealth*, 867 S.W.2d 200, 203 (Ky. App.1993) ("[I]t is clear that possession of a large amount of unexplained cash by itself is not an indicia of criminality ...."). Even when other indicia of criminality exist, *i.e.*, possession of "tools of the trade," *United States v. Clay*, 346 F.3d 173, 179 (6th Cir.2003), the presence of the cash is generally relevant only when "unexplained." *United States v. Chandler*, 326 F.3d 210, 215 (3d Cir.2003) (evidence of large cash purchases coupled with tax evidence that tended to show the defendant had no legitimate source of income relevant to prove participation in conspiracy to distribute drugs); *United States v. Jackskion*, 102 F.2d 683, 684 (2d Cir.1939) (evidence of defendant's bank balance admissible only upon showing that it was normally between $500.00 and $1,000.00, and in a year it had increased to $8,000.00 without any explanation except criminal activity). When an alleged drug trafficker is shown to be unemployed, evidence of that person's possession of a large amount of money is naturally relevant. Justice Holmes, in the oft-cited case of *Commonwealth v. Mulrey*, 170 Mass. 103, 49 N.E. 91 (1898), held that evidence of deposits of money could help prove criminal conduct where the amount deposited was "much too large to be accounted for by [the defendant's] salary." *Id.* at 94.

If, however, as Hudson testified, Harrison was employed by Hayes, $340.00 could just as well have been a week's pay as proceeds from a drug transaction. The circumstantial evidence relied upon to prove Harrison's complicity to manufacture methamphetamine and possess the anhydrous ammonia found in the meth trailer was so tenuous and speculative that it was clearly unreasonable for the jury to have found guilt. *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). His convictions of those offenses must be reversed. *Moore v. Commonwealth*, 282 S.W.2d at 614–15 ("Mere acquiescence in, or approval of, the criminal act, without cooperation or agreement to cooperate in its commission, is not sufficient to constitute one an aider and abettor."); *see also United States v. Estrada–Macias*, 218 F.3d 1064, 1066 (9th Cir.2000) (evidence that defendant associated with members of drug conspiracy, that defendant lived in trailer near residence used by conspirators to manufacture methamphetamine, that evidence of conspiracy was present in defendant's trailer, that defendant's first name was written in one conspirator's address book, and that defendant initially did not admit that he lived in trailer held insufficient to sustain conviction for conspiracy to manufacture methamphetamine).

### 2. Possession of drug paraphernalia.

■ As noted, there was sufficient evidence from which a reasonable juror could believe beyond a reasonable doubt that Harrison occupied the "John Paul trailer" and possessed its contents. The presence of the partially eaten sandwich and glass of water on the table indicated that somebody had been a recent occupant of the trailer. The occupants of all of the other habitable trailers were accounted for, and Harrison's personal effects and pill bottles with his name on the prescription labels were found inside this trailer. In *Dawson v. Commonwealth*, 756 S.W.2d 935 (Ky. 1988), the presence in the apartment of bills and letters addressed to the defendant, an identification card containing his photograph, insurance papers in his name, clothing and boxes belonging to him, and evidence that the utilities were registered in his name, sufficed to prove that the defendant constructively possessed the controlled substances also found in the apartment. *Id.* at 936. While the evidence of constructive possession was not as compelling here as in *Dawson*, the evidence of Harrison's occupation of the "John Paul trailer" was sufficient to support his conviction of possession of the drug paraphernalia found therein. *Burnett v. Commonwealth*, 31 S.W.3d 878, 881 (Ky.2000) (evidence that cocaine was found in area of car next to where defendant had previously been seated sufficient to prove constructive possession of cocaine).

Harrison also contends that the items found in the "John Paul trailer," *i.e.*, the syringe, the needles, the tourniquet, etc., were not drug paraphernalia. Hudson testified that these items could be used to intravenously ingest methamphetamine. While Hudson also admitted that each item had a legitimate use that was not drug related, the fact that the items were stored together in immediate proximity of the nicotinamide was sufficient for a jury to reasonably believe they were intended to be used for ingestion of controlled substances. If so, they were drug paraphernalia. KRS 218A.500(1). Furthermore, a cutting agent is drug paraphernalia. *State v. Mische*, 448 N.W.2d 415, 418 (N.D.1989).

### 3. Receiving stolen property.

■ KRS 514.110 provides in pertinent part:

(1) A person is guilty of receiving stolen property when he receives, retains, or disposes of movable property of another knowing that it has been stolen, or having reason to believe that it has been stolen.

(2) The possession by any person of any recently stolen movable property shall be prima facie evidence that such person knew such property was stolen.

To prove Harrison "retained" Clement's stolen motorcycle, the Commonwealth needed only to show that he possessed it. *Hayes v. Commonwealth*, 698 S.W.2d 827, 830 (Ky.1985). However, while the concept of "constructive possession" applies to offenses and enhancements defined in KRS Chapter 218A, *Houston*, 975 S.W.2d at 927–28, "possession" for purposes of penal code offenses "means to have *actual* physical possession or otherwise to exercise *actual* dominion or control over a tangible object." KRS 500.080(14) (emphasis added).

There was no evidence that Harrison owned the "John Paul trailer" or the land on which it was located; or that he even had a key to the trailer, which Hudson found unlocked. The Commonwealth's justification for the warrantless search of the trailer was Hayes's consent to search and assertion that "I own it all." Harrison did not have exclusive access to the area outside the trailer where the motorcycle was found. *United States v. White*, 932 F.2d 588, 589–90 (6th Cir.1991) (evidence

insufficient to show even constructive possession where, although patch of marijuana was found three feet from defendant's trailer, defendant did not own the land or live on the land exclusively); *Kenney v. Commonwealth*, 199 Ky. 79, 250 S.W. 494, 495 (1923) (mere fact that recently stolen tobacco was found in defendant's unlocked barn, to which not only members of his own family, but also more distant relatives and mere acquaintances, had free access, insufficient to justify inference of guilt or to require him to explain its presence); *State v. Villaneuva*, 147 S.W.3d 126, 130 (Mo.Ct.App.2004) ("A defendant's exclusive control over the premises is sufficient to raise an inference of possession and knowledge. However, joint control of the premises requires further evidence to prove the defendant knew the substance was present and had it under his control.").

■ Harrison's mere access to the area where the motorcycle was found is insufficient to support this conviction. "[M]ere presence near the stolen property, or access to the location where the stolen property is found is not sufficient evidence of possession, standing alone, to sustain a conviction for receiving stolen property." *People v. Land*, 30 Cal.App.4th 220, 35 Cal.Rptr.2d 544, 547 (1994); *see also United States v. Kearse*, 444 F.2d 62, 64 (2d Cir.1971).

Finally, the motorcycle had not been "recently stolen" so as to trigger the presumption of knowledge created by KRS 514.110(2). The owner of the motorcycle, Michael Clement, testified that it was stolen approximately three to four months before it was found on the Hayes farm.

### B. FAILURE TO BIFURCATE SUBSEQUENT–OFFENSE ENHANCEMENT.

■ Harrison's counsel did not object when the trial court read the indictment to the jury, including that the charge of possession of drug paraphernalia was a "second or subsequent offense." Nor did he object when the prosecutor repeated that information during opening statement. However, he did object when the prosecutor proposed to read the judgment of prior conviction to the jury during the guilt phase of the trial. Evidence of a prior conviction introduced only for enhancement purposes should always be reserved to the penalty phase of a trial. *Commonwealth v. Ramsey*, 920 S.W.2d 526 (Ky. 1996); *Clay v. Commonwealth*, 818 S.W.2d 264, 265–66 (Ky.1991). The trial court overruled the objection because "the cat was already out of the bag" and allowed the Commonwealth to introduce evidence of the prior conviction during the guilt phase, including the fact that one of the items of drug paraphernalia involved in the prior offense was a syringe. Since the present charge was also premised partially on the possession of a syringe, the prejudice is obvious. Harrison argued that he did not possess the syringe—but the jury knew that he had previously been convicted of the same offense for possessing a syringe. Even if Harrison waived mention of "second or subsequent offense" by the trial court and the prosecutor, those words were substantially less prejudicial to Harrison than the admission of the judgment of conviction and identification of the paraphernalia that led to that conviction. Upon retrial, evidence of the prior offense shall be reserved for the penalty phase.

### C. DISQUALIFICATION OF ASSISTANT PROSECUTOR.

An assistant Commonwealth's attorney who actively participated in the prosecution of this case had been the trial court's law clerk when the suppression hearing was held and attended the suppression hearing in that capacity. She took notes

for the purpose of preparing a memorandum of facts and law on the issues raised by the suppression motion. Harrison's motion to disqualify her from the prosecution team was overruled. KRS 15.733(2)(e) provides:

> Any prosecuting attorney shall disqualify himself in any proceeding in which he. . . .
>
> . . . .
>
> (e) Has served in private practice or government service, other than as a prosecuting attorney, as a lawyer or rendered a legal opinion in the matter in controversy. . . .

As will be discussed *infra*, the trial court never ruled on Harrison's suppression motion; thus, the prosecutor/former law clerk did not prepare a legal memorandum on the issue. Thus, we need not address whether the preparation of a legal memorandum, or even a draft opinion, by a judicial law clerk at the direction of her judicial employer constitutes "rendering" a legal opinion, especially where, as here, the law clerk was then still awaiting the results of her bar examination.

## D. TRIAL COURT'S FAILURE TO RULE ON SUPPRESSION MOTION.

The hearing on Harrison's motion to suppress the evidence found during Hudson's warrantless search of the "John Paul trailer" was held on October 11, 2002. On February 11, 2003, the trial court sent a letter to Harrison's defense counsel as follows:

> Dear Lew:
>
> There is now pending a Motion by Mr. Harrison to suppress a portion of the evidence seized from a trailer located on the premises owned or controlled by Johnnie Hayes.
>
> At the time of the search, your client advised the police that he did not live there and, in fact, lived in a different county. He needs to decide if he is going to claim the "Hayes" trailer as his home or not. If you will recall, located very near that trailer was a stolen motorcycle that was surely in the possession of the occupant of the subject mobile home. However, if Mr. Harrison did not actually live there, as he told the police that evening, then he lacks standing to question whether or not Mr. Hayes had authority to give permission. Anyway, your client must make an election before I rule.
>
> Please advise.
>
> Respectfully,
>
> /s/_____
>
> Judge

In essence, the trial court, as he would later do to Hayes at trial, required Harrison to make a Hobson's choice: either claim residency in the "John Paul trailer" and run the risk of conviction of receiving stolen property (and possession of drug paraphernalia), or deny residency and abandon the suppression motion. Ultimately, Harrison "elected" to withdraw his claim of residency in the "John Paul trailer."[9] The trial court never ruled on the suppression motion.

 The trial court was required to rule on the suppression motion on the basis of evidence presented at the suppression hearing. If Harrison had elected, for purposes of the suppression motion, to maintain that he resided in the "John Paul trailer," that election could not have been used against him at trial. *Simmons v.*

---

9. This election had the effect of withdrawing Harrison's claim of "standing" while permitting the Commonwealth to repeatedly refer to the mobile home at trial as the "John Paul trailer."

*United States*, 390 U.S. 377, 390, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968) (evidence used to establish standing during a suppression hearing is not admissible, over objection, at trial); *Shull v. Commonwealth*, 475 S.W.2d 469, 472 (Ky.1971) (same); *Commonwealth v. Bertram*, 596 S.W.2d 379, 380 (Ky.App.1980) (same). It is "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons*, 390 U.S. at 394, 88 S.Ct. at 976. Nevertheless, Harrison announced ready for trial without obtaining a ruling on his suppression motion. "[I]f an objection is made, the party making the objection must insist that the trial court rule on the objection, or else it is waived." *Bell v. Commonwealth*, 473 S.W.2d 820, 821 (Ky.1971). Nothing precludes Harrison from renewing his suppression motion prior to retrial.

Because we are vacating Harrison's convictions of manufacturing methamphetamine and possession of anhydrous ammonia in an unapproved container, we need not address whether there was a sufficient nexus between those offenses and the firearms found on the Hayes farm to permit a "firearm enhancement" of those convictions under KRS 218A.992. *See Commonwealth v. Montaque*, 23 S.W.3d 629, 632–33 (Ky.2000).

\* \* \* \* \* \*

Accordingly, Hayes's convictions of manufacturing methamphetamine and possession of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine, and the sentences imposed for those convictions, are reversed and remanded to the Grayson Circuit Court for a new trial in accordance with the content of this opinion; Harrison's convictions of manufacturing methamphetamine, possession of anhydrous ammonia in an unapproved container with intent to manufacture methamphetamine, and receiving stolen property, and the sentences imposed for those convictions, are vacated; and Harrison's conviction of possession of drug paraphernalia and the sentence imposed for that conviction, is reversed and remanded to the Grayson Circuit Court for a new trial in accordance with the content of this opinion.

LAMBERT, C.J.; JOHNSTONE, and SCOTT, JJ., concur.

ROACH, J., dissents by separate opinion with GRAVES, and WINTERSHEIMER, JJ., joining that dissenting opinion.

Dissenting opinion by Justice ROACH.

After noting that the evidence against Hayes was "overwhelming" and rejecting all of his claims of error save one relating to voir dire, the majority opinion, in a conclusory fashion, proclaims the voir dire error is not subject to harmless error. Because the majority opinion relies on inapplicable cases and refuses to consider harmless error, I dissent.

## I. HAYES'S ALLEGATION OF ERROR

Let us begin with what actually occurred at trial. No prospective juror indicated that he or she would hold the fact that Hayes did not testify against him. Significantly, the majority opinion relies on several cases where prospective jurors indicated that they would likely draw an adverse inference against the defendant for failing to testify. *See Humble v. Commonwealth*, 887 S.W.2d 567, 569–71 (Ky. App.1994); *State v. Scott*, 482 S.W.2d 727, 732–33 (Mo.1972); *People v. Bludson*, 97 N.Y.2d 644, 736 N.Y.S.2d 289, 761 N.E.2d 1016, 1018 (2001); *State v. Hightower*, 331 N.C. 636, 417 S.E.2d 237, 240 (1992). Here, because no prospective juror ever stated that he or she would hold Hayes's

exercise of his right to remain silent against him, these cases are inapplicable.

Additionally, the jury, on more than one occasion, indicated that it would follow the court's instructions. The trial court gave the jury the following instruction:

A Defendant is not compelled to testify and the fact that the Defendant did not testify in this case cannot be used as an inference of guilt and should not prejudice him in any way.

Although the trial judge could have allowed the voir dire exchange and would have been well advised to do so, I do not believe that this failure amounted to an abuse of discretion. *See* RCr 9.38 (allowing the parties to engage in voir dire that the trial court "deems proper").

The majority opinion relies in part on *United States v. Blount*, 479 F.2d 650, 651 (6th Cir.1973), where the appellate court found the trial court's limitation on voir dire to be an abuse of discretion. But *Blount* considered the presumption of innocence, not the right to silence. More importantly, *Blount* has been discredited across the nation. *See United States v. Price*, 577 F.2d 1356, 1366 (9th Cir.1978) (rejecting *Blount* and noting that it had also been rejected by the Second, Third, Fifth, Eighth and Tenth Circuits); *United States v. Miller*, 758 F.2d 570, 573 (11th Cir.1985) (rejecting *Blount* and noting that the Second, Third, Eighth, Ninth and Tenth Circuits "have uniformly held that it is not a per se abuse of discretion to refuse to ask prospective jurors questions concerning propositions of law involving burden of proof or presumption of innocence" (citations omitted)); *United States v. Wooton*, 518 F.2d 943, 947 n. 7 (3rd Cir.1975) ("We recognize that a divided Sixth Circuit has held to the contrary. *United States v. Blount*, 479 F.2d 650 (6th Cir.1973). Believing that the majority opinion there did not address the panoply of considerations

marshaled heretofore, which we deem significant and controlling, we decline to follow our sister Circuit."); *United States v. Price* 888 F.2d 1206, 1211 n. 6 (7th Cir. 1989) (noting that other courts have refused to follow *Blount* and then holding that those "cases further weaken the defendant's attempt to use *Blount* as support for his suggested general rule that a trial judge commits reversible, constitutional error by not asking a particular question the answer to which might form the basis for a for-cause challenge.").

The most important indicator of *Blount*'s limited precedential value, however, is the Sixth Circuit's narrow reading of the case in *United States v. Aloi*, 9 F.3d 438 (6th Cir.1993). *Aloi* clearly supports the conclusion that no error occurred in this case during voir dire. The following exchange occurred at trial in *Aloi*:

Defense counsel made the following request of the District Court during voir dire of the jury:

MR. FORTADO: I would like the Court to instruct them or inquire of them as to their knowledge of the Defendant's right not to testify, not to incriminate.

THE COURT: I don't do that. I do it throughout the trial every chance I get. It's a very strong instruction at the end.

*Id.* at 440. The Sixth Circuit then framed the issue in the following manner:

Defendant argues that he was entitled to have this specific question asked during voir dire. He also complains that the court did not remind the jury during the trial that defendant was not required to testify. The following instruction was given by the court to the jury:

The Defendant is presumed by the law to be innocent. The law does not require a Defendant to prove his innocence or produce any evidence at all, and no inference whatever may be

drawn from the election of the Defendant not to testify. The Government has the burden of proving him guilty beyond a reasonable doubt of each and every essential element of the crime charged and if it fails to do so you must acquit him.

*Id.* at 440–41.

The Sixth Circuit, noting that the defendant was relying on *Blount* to support his claim of error, specifically refused to extend that case to cover voir dire concerning the privilege against self-incrimination:

The issue here is whether this Court will extend the principle of *Blount* to the facts of this case, where the requested question dealt not with the presumption of innocence, but with the right of a criminal defendant not to testify against himself. The Supreme Court has held that the failure of a trial court "to limit the jurors' speculation on the meaning of" a defendant's silence when he chooses not to testify, by giving a requested limiting jury instruction, "exacts an impermissible toll of the full and free exercise" of the Fifth Amendment privilege against self-incrimination. *Carter v. Kentucky*, 450 U.S. 288, 305, 101 S.Ct. 1112, 1121, 67 L.Ed.2d 241 (1981). The Court did not suggest that the subject must also be covered in voir dire. The specific question asked here, namely, the jurors' "knowledge" of a defendant's right not to testify, would not itself be a ground for a challenge for cause. Only if after being instructed that the defendant's failure to testify could not be held against him and the refusal or inability to comply with that instruction, could they be challenged for cause. *We hold that the failure of the District Court to honor the request did not create the risk of empaneling a biased jury, given the court's voir dire questions and jury instructions about the presumption of innocence and its instruction that "no inference whatever may be drawn from the election of the defendant not to testify."*

*Id.* at 441 (emphasis added). The majority implies that the Sixth Circuit's refusal to extend *Blount* was due, at least in part, to the fact that the defendant asked to question prospective jurors during voir dire as to their knowledge of his right to remain silent, rather than asking whether they would draw an adverse inference from his exercise of that right. However, it is clear that this subtle distinction was not the reason for the *Aloi* court's refusal to extend *Blount* to the right to remain silent.

I agree with the Sixth Circuit that the Constitution does not require that the Fifth Amendment privilege against self-incrimination "must also be covered in voir dire." *Id.* Thus I cannot conclude that it was an abuse of discretion for the trial court not to allow Appellant to ask his questions on that subject. And because the trial court ultimately instructed the jury on that privilege, I cannot say that "the trial court's failure to ask these questions . . . render[ed] the defendant's trial fundamentally unfair" so as to require reversal. *Mu'Min v. Virginia*, 500 U.S. 415, 425–26, 111 S.Ct. 1899, 1905, 114 L.Ed.2d 493 (1991).

## II. HARMLESS ERROR

Equally troubling, however, is the majority opinion's proclamation that harmless error does not apply to the present situation. The opinion relies on *Oswald v. Bertrand*, 374 F.3d 475 (7th Cir.2004), to support this conclusion. In *Oswald*, the trial court sent jury questionnaires to 156 individuals, "more than 80 percent of whom responded that on the basis of the media coverage of the crime they thought that Oswald was guilty." *Id.* at 479. It took over four days of voir dire to narrow the

list to 29. On the last day the following exchange occurred:

> Roger Klitzka, in the course of being voir dired, said, "I know I've learned more in the last three days here sitting down there in that room about this case than I have since the day that it happened .... [A]ccording to what I hear, the young man is guilty of what he is being accused of and things like that and everything and I just think it's just a waste of time." The judge asked him whether he meant "it's a waste to have the trial at all," and Klitzka confirmed that that was indeed what he meant.
>
> Apparently this was not just Klitzka's personal opinion (he was not selected for the jury). The implication of what he said was that the entire jury pool had made up its mind that Oswald was guilty.

*Id.*

In the face of these statements by a prospective juror about the entire jury pool, the trial judge still refused to make the prospective juror respond to defendant's counsel's inquiries concerning what he had heard while the jury pool was discussing the case. The Seventh Circuit noted that "[e]ven though the circumstances strongly suggested that the jury had made up its mind that Oswald was guilty, the judge refused either to question Klitzka further or to recall for further questioning any of the prospective jurors who had already been voir dired." *Id.* After noting other juror selection irregularities, the court concluded that there was "a high probability that some, maybe all, of the jurors who tried Oswald were biased." *Id.* at 480. The divided court then reversed the conviction because the right "to be tried before an impartial tribunal ... is one of the handful of rights of a criminal defendant that is not subject to the doctrine of harmless error." Id. at 482.

It is clear, however, that *Oswald* addressed a fundamentally different issue than that presented in this case because it dealt with *actual juror bias, namely the belief that the defendant was guilty.* Here there is no evidence that any juror held Hayes's decision not to testify against him—there is no *actual evidence* of juror bias. Rather, the inquiry in this case is simply whether the trial court's failure to allow a question at voir dire concerning the privilege against self incrimination is subject to harmless error analysis. This question is distinct from that addressed in *Oswald,* where the trial judge refused additional voir dire questioning *after* a juror's testimony suggested other members of the jury pool were actually biased. Aside from the opinion of the majority, I am unable to find a case in America that would refuse to apply harmless error in these circumstances.

In fact, the United States Supreme Court has strictly limited those cases where harmless error is inapplicable, having

> recognized that "most constitutional errors can be harmless." *Fulminante, supra,* at 306, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302. "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). *Indeed, we have found an error to be "structural," and thus subject to automatic reversal, only in a "very limited class of cases."* Johnson v. United States, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437,

71 L.Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction)).

*Neder v. United States,* 527 U.S. 1, 8, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999) (alterations in original, emphasis added). The Supreme Court recently reaffirmed this principle, stating that "[i]t is only for certain structural errors undermining the fairness of a criminal proceeding as a whole that even preserved error requires reversal without regard to the mistake's effect on the proceeding." *United States v. Dominguez Benitez,* 542 U.S. 74, 81, 124 S.Ct. 2333, 2339, 159 L.Ed.2d 157 (2004); *see also United States v. Gonzalez–Huerta,* 403 F.3d 727, 734 (10th Cir.2005) ("The Court has found structural errors only in a very limited class of cases"); *United States v. Padilla,* 415 F.3d 211, 219 (1st Cir.2005) (stating that the Supreme Court has "recognized the existence of a tiny class of structural errors" that "includes only the most pervasive and debilitating errors").

The Supreme Court itself has repeatedly identified only *six* structural errors. *E.g., Neder,* 527 U.S. at 8, 119 S.Ct. at 1833 (citing *Johnson v. United States,* 520 U.S. 461, 468–69, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) and its recognition of structural error in only six circumstances: (1) a total deprivation of the right to counsel; (2) lack of an impartial trial judge; (3) unlawful exclusion of grand jurors on the basis of race; (4) denial of the right to self-representation at trial; (5) denial of the right to a public trial; and (6) an erroneous reasonable doubt instruction to the jury); see also *Gonzalez–Huerta,* 403 F.3d at 734 n. 5 (noting the six structural errors the Supreme Court has identified); *Padilla,* 415 F.3d at 219 (same); *Lewis v. Pinchak,* 348 F.3d 355, 358 (3d Cir.2003) (same); *State v. Torres,* 208 Ariz. 340, 93 P.3d 1056, 1059–1060 (2004) (same).

Recently, in a unanimous *en banc* decision, the Eighth Circuit surmised "that the Supreme Court meant for its lists of structural errors in *Fulminante* and *Neder* to be exhaustive." *United States v. Allen,* 406 F.3d 940, 945 (8th Cir.2005) (en banc). The North Carolina Supreme Court has also declined to extend structural error analysis beyond the "six cases enumerated by the United States Supreme Court." *State v. Garcia,* 358 N.C. 382, 597 S.E.2d 724, 745 (2004). This conclusion is further supported by the fact that the Supreme Court has had several opportunities to expand its list of structural errors, but has consistently refused to do so. *See, e.g., Johnson; Neder.* Even if one were not persuaded that the list of structural errors in *Fulminante* and *Neder* is exhaustive, the majority opinion has utterly failed to make its case that the alleged voir dire error—a relatively minor event at most—is within the "tiny class of structural errors" that includes only the "most pervasive and debilitating errors." *Padilla,* 415 F.3d at 219. It simply strains reason for the majority to claim that the alleged error at issue was so pervasive and debilitating as to infect "the framework within which the trial proceed[ed]," thus allowing Appellant to evade harmless error review through the application of the structural error doctrine. *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

Moreover, our own Criminal Rules *require* that we undertake harmless error review:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order, or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. *The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.*

CR 9.24 (emphasis added). Absent some overriding constitutional mandate, we must determine whether an error is harmless before finding that an error is reversible. Since there is no evidence that a juror who was seated drew an adverse inference against Harrison and since the jury was properly instructed, I cannot discern any error that affected his substantial rights.

### III. CONCLUSION

In accordance with the foregoing discussion, I would affirm Hayes's convictions based on the overwhelming evidence against him.

I agree with the majority's opinion as to Harrison, though I would affirm his conviction for possession of drug paraphernalia.

GRAVES and WINTERSHEIMER, JJ., join this dissenting opinion.